**FRIENDS OF the SAKONNET, Aurelio and Francine Lucci, Michael and Linda Kenfield, and Tim and Linda Boudewyns**

v.

**Bernard DUTRA, Eugene Lawrence Alofsin, David LaRoche, and Q.L.C.R.I., Inc.**

**James E. O'NEIL, Attorney General of Rhode Island, and Robert Bendick, Jr., Director of Rhode Island Department of Environmental Management**

v.

**Q.L.C.R.I., INC., Bernard R. Dutra, David F. LaRoche, the LaRoche Grantor Income Trust, David L. Brodsky, P. Alan Ryan, Carolyn Rose, a.k.a. Carolyn McElroy, Paul E. Buff, Davisville Credit Union, and Suffield Bank.**

Civ. A. Nos. 88–704P, 88–705P.

United States District Court,
D. Rhode Island.

May 18, 1990.

---

624

Betsy Grossman de Leiris, Newport, R.I., S. Paul Ryan, East Providence, R.I., Timothy M. Boudewyns, Portsmouth, R.I., Michael Rubin, Sp. Asst. Atty. Gen., Charles P. Messina, Kendra Beaver, Dept. of Environmental Management, Providence, R.I., for plaintiffs.

James L. Paradise, Middletown, R.I., pro se.

Kenneth R. Tremblay, Tremblay & Gorton, Portsmouth, R.I., Donato Andre D'Andrea, Newport, R.I., Bruce Hunter Cox, Slepkow, Slepkow & Bettencourt, Inc., East Providence, R.I., Matthew Medeiros, Flanders & Medeiros, John Voorhees, Tillinghast, Collins & Graham, Providence, R.I., William Y. Chaika, Chaika & Chaika, Cranston, R.I., Stephen B. Lang, Barry Kusinitz, Martin Aisenberg, Temkin & Miller, Thomas H. Quinn, Jr., Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

Raw sewage from the Sherwood Village development in Portsmouth, Rhode Island, has been pouring into the Sakonnet River since at least 1969. This has not been a secret; the stretch of river near the development has been closed for twenty years to shellfishing and swimming due to the sewage; the state has issued orders to stop polluting that have gone unheeded and unenforced; a home has been rendered uninhabitable because sewage seeped into its cellar; the town of Portsmouth has made repairs to the septic system so that the sewage would be dumped out in the River instead of oozing down the hill and across the beach to the River; and the town has refused further building permits to the developers—owners of the failed septic system. But no one has stopped the fouling of the Sakonnet River, and no one has enforced the laws—laws that were de-

signed to put an end to this kind of disrespect for the environment.

The issue was brought to this Court in two citizen suits filed in December 1988. The first suit was filed by The Friends of Sakonnet[1] and several individual homeowners with property on the Sakonnet in the town of Portsmouth.[2] The plaintiffs in this suit charge the defendants—Q.L.C. R.I., the present corporate owner of the land on which the failed sewage system is located (the land); David LaRoche, the sole trustee of the Trust that owns Q.L.C.R.I.; and Bernard Dutra and Eugene Lawrence Alofsin, former owners of the land—with violations of the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (federal Clean Water Act) and state nuisance laws. The second citizen's suit was brought by Rhode Island Attorney General James E. O'Neil and the Director of the Rhode Island Department of Environmental Management Robert Bendick (the state plaintiffs) in their respective capacities as state environmental advocate and director of the state agency in charge of enforcing the federal and state water pollution laws. These state plaintiffs have sued Q.L.C.R.I., David LaRoche, the LaRoche Grantor Income Trust (which owns Q.L.C.R.I.), Bernard Dutra (in his capacity as past owner of the land and as a manager for Q.L.C.R. I.), Carolyn Rose and Paul Buff (in their capacities as employees and managers at Q.L.C.R.I.), David Brodsky and P. Alan Ryan (to whom Q.L.C.R.I. transferred the land for very short periods of time); and the Suffield Bank and the Davisville Credit Union (each of which hold a mortgage on the land).[3] The state plaintiffs claim that

---

1. The Friends of the Sakonnet describes itself as "an unincorporated association of homeowners, organized in 1988 for the purpose, *inter alia,* of promoting, improving and protecting property values in the area represented by the Association, namely those areas of the Town of Portsmouth, County of Newport and State of Rhode Island, which areas are bounded on the east by the Sakonnet River. The purpose of the Association is further to prevent pollution of the beach and shell fishing beds bordering the Sakonnet River. The Association represents approximately 200 members, all off whom are homeowners in the area above described, and many of whom use the said Sakonnet River for recreational

activities." *See* Complaint (C.A. No. 88–704) at para. 4.

2. Save the Bay, Inc., a non-profit corporation chartered in Rhode Island, has intervened as a plaintiff in this suit. Save the Bay states that its interests have been adversely affected by the discharging of pollutants into the Sakonnet from the Sherwood Village septic system. Complaint of Intervenor Save the Bay, Inc. at para. 3 and 4.

3. The state plaintiffs assert that these institutions should only be held liable if they foreclose on their mortgages.

these defendants have violated the federal Clean Water Act, the Rhode Island Clean Water Act (R.I.Gen.Laws §§ 46–12–1 *et seq.*), a 1979 Order from the Rhode Island Department of Environmental Management (DEM) that ordered the then owners of the sewage system to cease discharging into the Sakonnet River without a license, and state public nuisance laws. The plaintiffs are asking for declaratory, injunctive, and monetary relief.[4] The two suits were consolidated by this Court.

After the complaints were filed, the defendants (Landowners) brought a third-party complaint against the homeowners in the Sherwood Village subdivision (Homeowners) and Donna Barker in her capacity as financial director for the town of Portsmouth. The Landowners claim that the Homeowners should be held jointly and severally liable if the Landowners are found liable because the Homeowners have a dominant tenement on the Landowners' land and because the Homeowners are the "point source" of the pollution under the Clean Water Acts. The Homeowners counterclaimed against the Landowners. The defendants seek to hold Barker liable as financial director of Portsmouth because, according to defendants, the town is the owner of the pipe that is discharging the sewage into the Sakonnet and therefore the town should be held liable under the state and federal Clean Water Acts.

Previous to today, this Court has executed an attachment on the Landowners' property for $3.5 million and has imposed a temporary restraining order on Q.L.C.R.I. and David LaRoche. The restraining order mandates that sewage be prevented from entering the Sakonnet River from Q.L.C.R. I.'s land.[5] Still before this Court are various summary judgment motions and preliminary injunction motions.

## I. BACKGROUND

The Sherwood Village subdivision in Portsmouth, Rhode Island, was developed near the Sakonnet River in the middle 1950s. The development contains thirty-three single-family residences and a number of undeveloped lots. The developer laid sewer lines under the streets of the development, and all thirty-three homes are connected to these sewer lines. The lines under the streets ran to a tract of land owned by the developer where, in the 1950s and early 1960s, the sewage was collected in a large communal septic tank, then deposited in a leaching field and chlorinated before being drained through an outfall pipe into the Sakonnet River (the septic system). Within recent memory the Homeowners have not paid sewage fees for the disposal of their waste water; it is unclear if they ever have. Sometime before 1969, the developer sold the land containing the septic system, as well as an adjacent track of undeveloped land along the Sakonnet River, to Sarfco, Inc.

By 1969 the septic system had failed and raw sewage was running into the Sakonnet River. The state closed the River to shellfishing in the immediate area of the devel-

---

**4.** The plaintiffs seek, *inter alia,* a declaration that the defendants have violated the law; injunctions ordering the defendants to cease polluting the Sakonnet River and to replace the sewage system; civil fines for violation of the state and federal clean water acts; compensatory and punitive damages; and costs and fees.

**5.** The temporary restraining order requires Mr. LaRoche to install collection tank(s) that will intercept the sewage coming from the Homeowners' houses. These tanks are to be pumped as they fill up. The order was imposed on March 5, 1990, and was to remain in effect, by agreement of the parties, for twenty days. The Court ordered the parties to submit briefs on certain issues within 10 days. The new counsel for Mr. LaRoche then requested, on the day briefs were due, a 30–day extension to file his

brief. The Court granted the extension until April 13. The plaintiffs, who had already filed their briefs, were given until April 20 to file responses. Based on the timing established in the initial deadlines, the TRO was extended to May 2. Mr. LaRoche's brief was delivered to the Court Clerk's Office after closing on April 16. Plaintiffs' responses were accordingly delayed. The United States government, which had initially promised to deliver a requested amicus brief in early April, informed the Court that it could not submit its brief until May 4 (the government's brief was not actually submitted until May 14). On April 25, the Court asked for and received permission from Mr. LaRoche to extend the TRO for an additional two weeks until May 16.

opment, and swimming in the area has been prohibited. The Rhode Island Department of Environmental Management investigated the septic system in 1979. This investigation revealed that raw sewage was running directly from the leaching field, on the surface of the ground for approximately 250 feet, into the Sakonnet River and into the basement of a home [6] located between the septic system and the River. Sewage also reached the River through the outfall pipe. Approximately 8,000 gallons per day of raw sewage was reaching the River from the failed system. The state repeatedly advised Sarfco of this problem, but Sarfco took no action to correct the system. After holding a formal hearing, DEM issued a notice of violation under Rhode Island law to Sarfco. The decision and order that issued from this hearing (the 1979 Order) held Sarfco solely responsible for correcting the septic system. An appeal was taken by Sarfco to the Providence Superior Court; that appeal was dismissed with prejudice by stipulation. Sarfco never complied with the Order. The town of Portsmouth, with a permit from DEM,[7] made emergency repairs to the outfall pipe. The town billed Sarfco for these repairs, placing a lien on the property when the bill went unpaid. Sarfco eventually paid. The home into which sewage ran is uninhabitable.

Sarfco sold the land to defendants Dutra and Alofsin in 1981. Dutra and Alofsin knew of the outstanding 1979 DEM Order when they bought the property. Sarfco, Inc. was defaulted by the Rhode Island Secretary of State sometime after this sale. In 1983 Dutra and Alofsin were served with notices of violation of state water pollution laws; the Homeowners were served with similar notices. No hearings were held on these notices of violation. The notices were not complied with.

Late in 1986 defendants Dutra and Alofsin sold their property to defendant Q.L.C. R.I. Again the buyers had knowledge of the outstanding 1979 DEM Order. In 1988 Q.L.C.R.I. was contacted by the United States Army Corps of Engineers about the raw sewage entering the Sakonnet River. The Corps pointed out that no permit had been issued by any federal or state agency that could authorized the outfall pipe in the river or could authorize the discharge into the river. Q.L.C.R.I. was notified of the criminal sanctions for violation of the Clean Water Act. The Corps requested answers to certain questions within fifteen days. Also in 1988, DEM sent Q.L.C.R.I. a letter demanding that an acceptable plan for a sewage treatment facility be submitted immediately.

The case is now before this Court on numerous motions.[8] Because the solutions to many of the motions rely on the same

6. This home, which belongs to the Souza family, is not one of the Sherwood Village homes, although the land on which it is located was initially part of the subdivision developer's land. The home is not connected to the failed septic system.

7. The DEM permit gave Portsmouth permission to make "emergency repair" to Sarfco's septic system. The permit specifically stated that "[t]his approval in no way seeks to abridge or amend the outstanding order versus Sarfco, Inc. dated 17 July 1979." Response of Third Party Defendant Donna Barker in Her Capacity as Finance Director for the Town of Portsmouth to the Memoranda Submitted by the Defendants Herein, Exhibit B.

8. 1) The Friends of Sakonnet have filed a motion seeking summary judgment on liability and have asked for an injunction to prevent further polluting of the Sakonnet River. 2) The Attorney General and Director of DEM have moved for summary judgment against Q.L.C.R.I. on

liability. 3) The defendants have moved to amend their answer to the Friends of Sakonnet Complaint to add the affirmative defense of failure to join indispensable parties. 4) The defendants have moved for summary judgment against the Attorney General and Director of DEM. 5) Defendants Dutra and Alofsin have moved for summary judgment against the Friends of Sakonnet. 6) Third-party defendant Barker has moved for summary judgment against third party plaintiffs (defendants). 7) Defendants Q.L.C.R.I., David LaRoche, and the LaRoche Grantor Income Trust have moved for a preliminary injunction against the Homeowners ordering that they be held financially responsible for all measures for which the above-named defendants may be held responsible. 8) Defendants Dutra and Alofsin have requested that this Court hold further hearings before ruling on the plaintiffs' preliminary injunction motion.

questions of law, this opinion will first address the relevant questions of law. The motions will then be dealt with individually.

## II. POINT SOURCE

### A. Background

The federal Clean Water Act, which is closely tracked by the state's clean water act,[9] decrees that "the discharge of any pollutant by any person [without a permit] shall be unlawful." 33 U.S.C. § 1311(a). The Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Much of the legal debate in this case has revolved around the definition of "point source"; the plaintiffs and Homeowners are claiming that the Landowners/defendants as owners of the septic system are the point source and thus should be held liable under the law. The Landowners/defendants claim 1) that because the pollution comes from the Homeowners, they are the point source and should be held liable, 2) that because the pollution is being discharged through a pipe installed by the town of Portsmouth, the town is liable, and 3) that because the land between the septic system and the Sakonnet River, under which the pipe runs, is owned by third parties, the Souza family, the Souzas are the point source and liable under the state and federal Clean Water Acts.

Although the definition of a point source is important, by focusing on this definition, the parties in this case are isolating one subsection from the rest of a law that was written broadly to reach "to the fullest extent possible those sources emitting pollution into rivers, streams and lakes." *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir.1979). The words "point source" should not be separated from the words "addition of any pollutant," nor disassociated from what they are defining, "discharge of a pollutant." Dwelling on the words "point source" in isolation can lead to absurd results that do not promote the purpose of the Clean Water Act.[10] That purpose is to restore and maintain the chemical, physical and biological integrity of the nation's waters and to eliminate the discharge of pollutants into the navigable waters. 33 U.S.C. § 1251(a)(1). To do this, Congress has placed liability with those in control of the pollutants being discharged.

The parties have attempted to fit the facts in this case to those of the leading cases interpreting 33 U.S.C. § 1311(a). Those cases have focused on the question of what is and what is not point source pollution. The question has usually been raised in the context of a defendant claiming that the pollution coming from his or her property is not point source pollution and thus does not fall under the permit requirements of 33 U.S.C. § 1342. The courts in these cases have broadly interpreted the definition of point source to reach all pollution that comes from a confined system. *See, e.g., Sierra Club v. Abston Construction Co., Inc.*, 620 F.2d 41 (5th Cir.1980); *Earth Sciences*, 599 F.2d 368; *Fishel v. Westinghouse Electric Corp.*, 640 F.Supp. 442 (M.D.Pa.1986);

**9.** The Rhode Island law states: "It shall be unlawful for any person to discharge any pollutant into the waters except as in compliance with the provisions of this chapter and any rules and regulations promulgated hereunder and pursuant to the terms and conditions of a permit." R.I.Gen.Laws § 46–12–5(b).

**10.** Some of those absurd results have been proposed by the parties in this case. It has been suggested that the town of Portsmouth is solely liable simply because it was responsible for the

installation of a discharge pipe that forced the raw sewage to run through a pipe and be dumped out in the Sakonnet River rather than allowing the sewage to continue to run down the surface of the ground to the River. It has also been suggested, subtly, that the owners of the land between the septic system and the River are liable because the pipe from the system runs under their land before reaching the River. *See* Subsection B, *supra*.

*United States v. Saint Bernard Parish,* 589 F.Supp. 617 (E.D.La.1984); *O'Leary v. Moyer's Landfill, Inc.,* 523 F.Supp. 642 (E.D.Pa.1981). There was no intentional pollution in these cases; there were no pipes or manmade devices that carried the pollutants from the confined system or collection point to the navigable waters. The discussion in these cases was motivated by whether there was a point source for the pollution entering navigable waters, not who was responsible for the pollution if there was a point source.

These cases give great importance to the point source because the *existence* of a point source was contested. The concept of point source was developed to distinguish pollution resulting from simple erosion over the surface of the ground from pollution that has been collected or comes from a confined system.[11] "Point source" is in the definition of "discharge of a pollutant" to distinguish kinds of pollution, not to establish the source of liability. Liability must lie with the person or persons

causing "the addition of any pollutant to navigable waters."[12]

## B. Sherwood Village Septic System

■ There is no question in this Court's mind that the owners of the failed septic system are liable under 33 U.S.C. § 1311 for the noxious flow that has poured freely into the Sakonnet River for the last twenty-one years. Under § 1311, such a discharge from a privately owned treatment works without a permit is illegal.[13] Only the owners of the septic system could have obtained a permit for the discharge from their system.[14] When arguing that they are not a point source, the defendants are apparently challenging the validity of the regulations of the Environmental Protection Agency (EPA) that specifically require privately owned treatment works to obtain an NPDES permit. In determining that private treatment works must obtain an NPDES permit, the EPA must have determined that these works are discharging point source pollution.[15] For the reasons

11. "When Congress established the National Pollutant Discharge Elimination System (NPDES) in 1972 and concomitantly created a new approach to regulating and abating water pollution, it drew a distinct line between point and nonpoint pollution sources. Point sources are subject to direct federal regulation and enforcement under the Act. Nonpoint sources, because of their very nature are not regulated under the NPDES." *Oregon Natural Resources Council v. United States Forest Service,* 834 F.2d 842, 849 (9th Cir.1987) (citation and footnote omitted).

12. Even the cases specifically concerned with determining if a point source exists seem to recognize this. In *Sierra Club,* although the court was not considering whether the defendant owned the "conveyance" for the pollutants, the Sixth Circuit's determination of liability is based on control of the pollutants that ultimately reach navigable waters. "Gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the miner at least initially collected or channeled the water and other materials. A point source of pollution may also be present where miners design spoil piles from discarded overburden such that, during periods of precipitation, erosion of spoil pile walls results in discharges into a navigable body of water by means of ditches, gullies and similar conveyances, even if the miners have done nothing beyond the mere collection of rock and other materials. The ultimate question is whether pollutants were discharged from 'discernible, confined,

and discrete conveyance[s]' either by gravitational or nongravitational means. Nothing in the [Clean Water] Act relieves miners from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water. Conveyances of pollution formed either as a result of natural erosion or by material means, and which constitute a component of a mine drainage system, may fit the statutory definition and thereby subject the operators to liability under the Act." *Sierra Club,* 620 F.2d at 45.

13. The owners of the Sherwood Village septic system are required to obtain an NPDES (national pollutant discharge elimination system) permit under 33 U.S.C. § 1342 as they are discharging pollutants into navigable waters. *See also* 40 C.F.R. §§ 122.21(a) and 122.44(m).

14. Of course, neither the state nor the federal officials would have issued a permit for the discharge of raw sewage. See Regulations For the Rhode Island Pollutant Discharge Elimination System, Rules 9(f) and 16.05.

15. NPDES permits are only issued for the discharges of point source pollution. 33 U.S.C. § 1342(a). Furthermore, the EPA does not have discretion to determine what categories of point source discharges need a permit. *Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d

set forth below, this Court finds the Environmental Protection Agency's interpretation of the Clean Water Act in these regulations to be eminently reasonable and consistent with Congress' intent. *See Shanty Town Associates, Ltd. v. Environmental Protection Agency*, 843 F.2d 782, 790 (4th Cir.1988),

■ The defendants' attempt to strain the definition of "discharge of a pollutant" in order to relieve themselves of liability and to impose it on the town of Portsmouth or on Mr. and Mrs. Souza makes complete nonsense out of the Clean Water Act. Congress intended that the Clean Water Act eliminate the discharge of pollutants into the nation's waters. However, Congress realized that this goal had to be tempered by practicality, and it set up a system by which persons would be allowed to discharge pollutants if they first obtained a permit.[16] The Act requires those in control of the pollutants to use the best available control technology (BACT) to prevent harmful pollutants from being discharged before a permit will be issued for the discharge. It is those persons who violate the permit effluent limitations or discharge without a permit that 33 U.S.C. § 1311(a) seeks to hold liable.[17]

By attempting to hold either the town or the Souzas liable, the defendants are say-ing the law reaches those who have absolutely no control over the processes that the permit system regulates. Neither the town nor the Souzas could obtain a permit for the discharge into the Sakonnet River from the Sherwood Park septic system, yet the defendants would have this Court hold one of them liable for not obtaining a permit before another's pollution flowed through their property.[18] Do the defendants really believe the law requires, or should require, either the town or the Souzas to implement the BACT, which would be a new septic system, when the pollution is coming from the Homeowners and the defendants' failed septic system?

■ The defendants have further attempted to avoid liability under the federal and state Clean Water Acts by seeking either to share liability with the Homeowners or to place liability for the discharges exclusively with the Homeowners. None of defendants' arguments concerning the liability of the Homeowners will relieve the Landowners of liability. Although the EPA in their regulations interpreting the Clean Water Act have clearly stated that the users of a private treatment works are point sources, the discharges of the users do not in any way relieve the owners of the treatment works accepting the users' dis-

1369, 1374 (D.C.Cir.1977), although it can consider how to implement the permit program. *Id.* at 1381–83.

**16.** Congress ordered the Administrator of the Environmental Protection Agency to "develop and publish ... criteria for water quality accurately reflecting the latest scientific knowledge" on a variety of topics. 33 U.S.C. § 1314. The Administrator also establishes regulations based on these criteria and, with the states, is responsible for the permitting system under which a person may obtain a permit to discharge pollutants into navigable water. *See* 33 U.S.C. §§ 1311 *et seq.*

**17.** "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

**18.** Even if the Clean Water Act is interpreted as pinning liability on the owner of the actual "point" at which the unpermitted pollution flows into navigable waters, neither the town nor the Souzas could be held liable. Although the town installed the outflow pipe that conducts the sewage into the middle of the Sakonnet River, the owners of the septic system at the time paid the town for the work. The fact that the town had to impose a lien on Sarfco's property before the work was paid for, does not vitiate Sarfco's responsibility for this work. In the case of the Souzas, the pipe that runs under their property from the septic system is subject to an easement against their property. That easement was for the benefit of Fred R. Alofsin, the original developer of Sherwood Village, and his heirs and assignees "for the purpose of allowing access to the Sakonnet River, and to repair and maintain the sewerage discharge pipe which is located underground through this right of way." *See* Memorandum of Carolyn Rose, a.k.a. Carolyn McElroy and Paul E. Buff, Exhibit A. The easement passed to Fred Alofsin's successors in ownership of the land on which the septic system is located. *See Thomas v. Ross*, 119 R.I. 231, 376 A.2d 1368 (1977); *Crawford Realty Co. v. Ostrow*, 89 R.I. 12, 150 A.2d 5 (1959).

charge from responsibility for the treatment works' discharges. Under the EPA's interpretation of the Clean Water Act, both the Homeowners and the Landowners are discharging from point sources.[19] However, only the question of the Landowners' liability under the state and federal Clean Water Acts is before this Court.

Although the EPA has determined that users of private treatment works are "discharging a pollutant" as defined in § 1362(12), as the federal and state regulations are set up, domestic users of private treatment works are not required to obtain an NPDES permit.[20] The law only requires the treatment works into which the domestic users are discharging to have a permit.

## III. ACTIONS AGAINST PAST OWNERS

### A. Clean Water Act

■ Defendants Dutra and Alofsin, past owners of the Sherwood Village septic system, argue that they cannot be held liable under the Clean Water Act because any violation for which they are responsible is in the past. According to these defendants, the Supreme Court in *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), decided that the Clean Water Act does not confer jurisdiction in citizens' suits for wholly past violations. While this statement is true, *Gwaltney* does not provide the definitive answer that the defendants attribute to it.

In *Gwaltney* the Court did decide that a citizen's suit could not be brought for wholly past violations of the NPDES permit conditions; however, that holding was referring to the violation of the Act being in the past. In the present case, the violation of the Act has been continuing and was occurring when the suits in this case were filed. It is only a *violator*, not the *violation*, that can be said to be in the past. This distinction is not merely semantic. In the *Gwaltney* situation, no further polluting of the nation's waters is taking place because the violation has ceased; the purpose of the Act has been achieved. In the present Sakonnet situation, the polluting continues, although the actor polluting has changed.

The question in *Gwaltney* was whether a person who has violated the Act should be able to avoid liability under a citizen's suit when the violation has ceased prior to the commencement of the suit. The Supreme Court unanimously answered yes to that question. The question in the Sakonnet River situation is whether a person who has violated the Clean Water Act may avoid liability by relinquishing ownership of the polluting source although the violation continues. Although the two situations are distinct, the plain language of the citizens' suit statute, 33 U.S.C. § 1365(a),[21] that prompted the Supreme Court in *Gwaltney* to find no liability is controlling in the present case. The phrase "any person . . . who is alleged to be in violation" is clearly directed to a present violation by

**19.** In its amicus brief for this Court, the EPA bases its determination that both the Homeowners and Landowners are discharging pollution from point sources into navigable waters on the Clean Water Act's "broad definition of 'discharges of a pollutant'" and on the Act's exception for certain dischargers discharging through publicly owned treatment works in § 1311(b)(1). This Court makes no determination on the reasonableness of the EPA's decision to consider domestic users of a privately owned treatment works to be point sources. For the purpose of the motions presently before the Court, this need not be addressed.

**20.** Rule 16.05 of the Regulations for the Rhode Island Pollutant Discharge Elimination System (which is identical to 40 C.F.R. § 122.44(m)) sets procedures by which the Director of DEM can issue permits to privately owned treatment works; this Rule allows the Director to include conditions applicable to users in a permit for the treatment works and allows the Director to require separate permits for the users. However, Rule 9(f) (which tracks 40 C.F.R. § 122.3(g)) lists discharges of pollutants into privately owned treatment works as an activity that does not require a permit.

**21.** In relevant part, 33 U.S.C. § 1365(a) provides: "[A]ny citizen may commence a civil action on his own behalf (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation. . . ."

the person against whom the citizen suit is brought. Defendants Dutra and Alofsin are not presently violating the Act. Even if a court, as is the case with this Court, does not believe that Congress contemplated a specific situation or outcome when drafting a law,[22] that court cannot graft exceptions onto the law. The court "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). It is the legislative branch's responsibility to correct any defects that may be present in the law.

Further, the notice requirement of § 1365(b)(1)(A) [23] would serve little purpose in a suit against past owners of a pollution source. "[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney,* 108 S.Ct. at 382–83. Notice to Dutra and Alofsin by the plaintiffs of their intention to file suit does not give these defendants a chance to bring the pollution source into violation; they have no control over the pollution source.[24]

### B. Nuisance

■ Defendants Dutra and Alofsin rely on this Court's decision in *City of Man-*

*chester v. National Gypsum Co.,* 637 F.Supp. 646 (D.R.I.1986) when they assert that as past owners of the septic system they cannot be sued under a theory of nuisance for damages caused by their pollution of the Sakonnet River. Their reliance is misplaced. *National Gypsum* turned on the fact that the defendant was never in control of the instrumentality alleged to constitute the nuisance when the damage was alleged to have taken place.[25] That is not the case here. Dutra and Alofsin owned and controlled the septic system between 1981 and 1986, during which time pollutants from the system flowed into the Sakonnet River. This Court has discovered no Rhode Island (or other) precedent that bars recovery of nuisance damages simply because the defendants no longer control the instrumentality alleged to have caused the nuisance. If Rhode Island courts allow suits for nuisance damages to go forward although the nuisance itself ·has already been abated, *see Weida v. Ferry,* 493 A.2d 824, 826 n. 3 (R.I.1985), it follows that suits should be allowed, if within the statute of limitations, against one who is alleged to have caused damages by a nuisance even if that person no longer controls the alleged nuisance. In both situations, the damaged caused by the defendant's alleged operation of a nuisance is in the past and an injunction against the defendant would serve no purpose. The paramount question

---

**22.** Freeing defendants Dutra and Alofsin from liability for their violations simply because they have ceased controlling the pollution source impedes achievement of the Clean Water Act's purpose. This result encourages violators to transfer control of their property to avoid liability. Although the transfer by Dutra and Alofsin to Q.L.C.R.I. may not have been motivated by the threat of a suit, it was done with the knowledge that the septic system they were selling was in continuous violation of the federal and state Clean Water Acts. A key consideration in *Gwaltney,* as well as *Pawtuxet Cove Marina, Inc. v. Ciba–Geigy Corp.,* 807 F.2d 1089 (1st Cir. 1986), was that a violation must be continuing for a court to have jurisdiction over a citizen's suit. In this case, the violation of the Clean Water Acts has continued unabated. Thus, simply because of the present-tense wording of the statute, these defendants are able to avoid responsibility for their violations of the law because they sold their property, not because they stopped violating the law.

**23.** That section provides: "No action may be commenced under subsection (a)(1) of this section prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order...."

**24.** However, the notice requirement serves little purpose if an owner or operator can simply transfer control of the pollution source before the filing of a citizen's suit and avoid liability. This is what defendants Dutra and Alofsin have done.

**25.** Also, the decision in *National Gypsum,* although decided by this Court, was based on New Hampshire law and thus is not binding precedent for this case.

is whether the defendant was in control of the instrumentality alleged to have created the nuisance when the damage occurred. There is no dispute in this case that defendants Dutra and Alofsin were in control of the septic system between 1981 and 1986.

## IV. EFFECT OF THE 1979 ORDER AND THE 1983 NOTICES OF VIOLATION ISSUED BY THE RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

■ This Court has no authority to enforce the 1983 notices of violation issued by the Department of Environmental Management against defendants Dutra and Alofsin and against the Homeowners. As there was no hearing or final adjudication on these notices, there is nothing to enforce.

■ Defendants David LaRoche, Q.L.C. R.I., Inc., and the LaRoche Grantor Income Trust concede that the 1979 Order against Sarfco, Inc. is binding under the doctrine of collateral estoppel upon themselves as successors in interest to Sarfco. These defendants do not contest this Court's discretion to enforce this Order under the Court's discretionary pendant jurisdiction.[26] As the Order arose from the same set of facts and issues that are presented to this Court on the federal Clean Water Act claim,[27] the Court will exercise its pendant jurisdiction over this claim.

The Court does agree with defendant LaRoche that the Order does not solve all the problems. The Order determined that the defendants' predecessor in interest was in violation of the state's Clean Water Act

and that the predecessor in interest must reconstruct and repair the septic system according to plans approved by the state. The hearing officer stated that the state law speaks only to ownership and control of the septic system, and Sarfco owned and controlled the system and was therefore liable under the law. The officer also stated that although Sarfco's claim that the Homeowners had assumed a pro rata responsibility for the system's maintenance raised "an interesting question of equity," such questions were immaterial to the determination of liability under the state Clean Water Act. The hearing officer was only determining liability under that Act. The officer did not rule out an equitable claim against the Homeowners, he simply decided that it had nothing to do with the issues he was empowered to hear.

■ This Court does not believe, as the Homeowners have argued, that an equitable claim by the Landowners against the Homeowners is barred by the federal Clean Water Act. In *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987), the Supreme Court ruled that a state's common law is pre-empted by the Clean Water Act to the extent that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." An equitable suit against the Homeowners will not change the liability of the Landowners under the Clean Water Act, nor will it affect the Landowners' responsibility to erect a new septic system if so ordered by this Court under the authority of the Clean Water Act. All that

**26.** Defendants Dutra and Alofsin do contest the collateral estoppel effect of this Order and urge the Court not to exert its pendant jurisdiction because this will result in unfair prejudice to the defendants. First, the state plaintiffs' are not asking for summary judgment on this issue against defendant Dutra (defendant Alofsin is not a defendant in the state plaintiffs' suit, and enforcement of the 1979 Order is not part of the Friends of Sakonnet Complaint). Second, the challenges of Dutra and Alofsin to the use of collateral estoppel are without merit.

**27.** Defendants Dutra and Alofsin challenged the identity of issues and facts between the present situation and the situation at the time of the 1979 Order. *See* Memorandum of Law Request-

ed From Bernard R. Sutra and Eugene Lawrence Alofsin by Judge Pettine on February 26, 1990, at 7–8. This Court has demonstrated in Section II above that the installation of the outfall pipe by the town of Portsmouth and the ownership of the land between the septic system and the River by the Souzas is not a material fact to the determination of liability under the state and federal Clean Water Acts. Furthermore, the defendants are mistaken in their argument that Sarfco, against whom the 1979 Order was issued, owned the land between the septic system and the River. The Souzas owned this land at the time of the 1979 Order. Affidavit of Frank H. Souza, para. 1.

an equitable suit will do is to determine whether the Homeowners have an obligation to indemnify, partially or fully, the Landowners for their expenses. The Homeowners' argument would nullify even an explicit agreement between an owner of a septic system and its users that the users would pay for maintenance.

## V. DISPOSITION OF THE MOTIONS [28]

### A. Summary Judgment Motion of Friends of Sakonnet

The Friends of Sakonnet have moved for summary judgment on the issues of liability under the federal Clean Water Act and the state common law of nuisance against all defendants named in their suit.[29] Summary judgment is granted against LaRoche and Q.L.C.R.I. on the issue of liability under the federal Clean Water Act; judgment against defendants Dutra and Alofsin on this issue is denied. Summary judgment is denied against all defendants on the issue of liability under the common law of nuisance.

■■■ Based on the above discussions of "point source" and liability of former owners, the appropriateness of these summary judgment decisions on Clean Water Act liability is clear. In their first memorandum of law accompanying their objection to summary judgment, the defendants argued that it was in dispute whether there was sewage seeping into the Sakonnet River. However, the plaintiffs did present testimony and documentation of testing done after the plaintiffs had filed suit. Transcript of Hearing, February 26, 1990, at 3, and Statement of Material Facts Not in Dispute in Support of the Motion for Partial Summary Judgment of Plaintiffs Friends of the Sakonnet, Exhibit 7. The defendants did

not challenge these statements and test. Simple averments that there is no proof of pollution have no weight in the face of plaintiffs' direct proof. Other facts that the defendants claim are missing or in dispute are not material to the determination of liability for summary judgment.

■■■ The Court is unwilling to grant summary judgment at this time on the nuisance claim as the issue has hardly been discussed in the memoranda submitted by the parties. Further, no evidence has been submitted that the individual plaintiffs in this suit have suffered a particularized harm to their interests as required in a private nuisance suit.

### B. Summary Judgment Motion of State Plaintiffs

■■■ The motion of the Attorney General and Director of DEM for summary judgment on the liability of Q.L.C.R.I. under the state and federal Clean Water Acts, the 1979 Order, and Rhode Island common law of public nuisance is granted in its entirety. This defendant has conceded liability under the Clean Water Act and the 1979 Order (the 1979 Order determined the issue of liability under the state Clean Water Act, and this defendant does not challenge the collateral estoppel effect of that Order). *See* Memorandum of Defendants/Third Party Plaintiffs LaRoche, Q.L.C.R.I. and LaRoche Grantor Income Trust on Summary Judgment and Preliminary Injunction Issues, at 2–3. Under Rhode Island law, "[a] public nuisance is an unreasonable interference with a right common to the general public: it is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." *Citi-*

---

**28.** In analyzing the summary judgment motions below, this Court is required to examine the record in a light most favorable to the non-moving party. This does not mean that the Court accepts allegations of fact by the non-movant that are not substantiated by some evidence. But if the non-movant can show that a material fact is in dispute summary judgment will not issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). In this case it

is important to note that the mere existence of *some* factual disputes will not prevent summary judgment; the factual dispute must be material in that the dispute's determination in favor of the non-moving party could lead a jury to find a verdict for the non-moving party.

**29.** These plaintiffs, as well as the state plaintiffs, have also requested injunctive relief. For this Court's ruling on a preliminary injunction, *see* Section VI, *infra.*

*zens for Preservation of Waterman Lake v. Davis,* 420 A.2d 53, 59 (R.I.1980). It is undisputed that the pollution coming from the Sherwood Village septic system is responsible for polluting the Sakonnet River and closing that area of the River to shellfishing. *See* Complaint (C.A. No. 88–705), Exhibit 1. Further, the illegal dumping of sewage into the state rivers is a nuisance per se. *See* 58 Am.Jur.2d *Nuisances* § 18 (1989); *see also Board of Purification of Waters v. Town of East Providence,* 47 R.I. 431, 133 A. 812 (1926).

### C. Defendants' Motion To Amend Answer

■ Defendants seek to amend their Answer to add the affirmative defense of failure to join indispensable parties. The motion is denied; joinder of the parties that the defendants consider indispensable has been accomplished through defendants' own third-party complaint. The defense of failure to join indispensable parties under Fed.R.Civ.P. 12(b)(7) is not a defense against the merits of the case, it will only result in a dismissal of the case if a party cannot be joined and the court determines that this failure to join will result in undue prejudice to one of the parties. Fed.R. Civ.P. 19(b).

### D. Defendants' Motion For Summary Judgment Against State Plaintiffs

Defendants moved for summary judgment on the grounds that either the Homeowners or the town of Portsmouth was the "point source" of the pollution flowing into the Sakonnet and, therefore, the defendants could not be held liable under the Clean Water Act. The motion is denied. *See* Section II, *supra.*

### E. Motion For Summary Judgment by Defendants Dutra and Alofsin Against Friends of Sakonnet

In this motion defendants reassert their contention that they cannot be held liable under either the Clean Water Act or Rhode Island's common law of nuisance because they no longer own the land on which the septic system is located. The motion is granted in part. These defendants cannot be held liable, as a matter of law, under a citizen's suit of the federal Clean Water Act. *See* Section II, *supra.* Claim One of the Friends of Sakonnet suit as it applies to defendants Dutra and Alofsin is dismissed. Summary judgment, as it relates to the common law of nuisance (Claim Two), is denied. *See* Section III, *supra.*

### F. Third–Party Defendant Barker's Motion for Summary Judgment

Third Party Defendant Barker, in her capacity as financial director of the town of Portsmouth, moves for summary judgment on defendants/third party plaintiffs' claims against her. The motion is granted. *See* Section II, *supra.*

### G. Defendants Q.L.C.R.I. Motion For Preliminary Injunction Against the Homeowners

■ Defendants David LaRoche, Q.L.C. R.I., and the LaRoche Grantor Income Trust have asked for a preliminary injunction requiring the Homeowners immediately to assume financial responsibility for the temporary pumping that the defendants are now responsible for under the TRO issued by this Court on March 5, 1990, and for the construction of a new septic system. This motion is scheduled for hearing following the completion of the trial presently before this Court, *Beiser v. Jamestown Boat Yard.* The Court does not have sufficient uncontroverted facts before it to make the determinations necessary. The promises and obligations between the Homeowners or their predecessors and the developer of Sherwood Village in regard to the responsibility of each to maintain the septic system are clouded. Further, the source of, amount of, and responsibility for the groundwater that is infiltrating and overburdening the system is unclear (the statements of defendants' expert at the March 5, 1990, hearing differ from those in defendants' memorandum in support of this motion on this subject). If this Court is to construct an equitable and viable solution for this situation, it must have answers to these, and other, questions.

Further, the Court requests that both the DEM and defendant LaRoche have specific plans to offer this Court for a permanent solution. These plans should include specifications for a new facility, cost estimates, estimates of time it will take to build, and determinations as to the source of and solutions for groundwater infiltration. All information necessary for this Court to make a determination for a permanent solution should be available. Further, defendant LaRoche should present his plans to the DEM prior to this hearing; the DEM must approve the technical aspects of any solution this Court reaches. The Homeowners should be given an opportunity to review any plans that will be submitted to this Court.

Defendants have requested that this Court not rule on the plaintiffs' motion for preliminary injunction until this motion is decided. They argue that the financial burden is too great and that the Homeowners are legally responsible for the disrepair of the existing system and the construction of a new system. However, the Court cannot, without a hearing, make the findings of fact necessary for the legal conclusions the defendants ask this Court to draw. Further, it is not inequitable to require these defendants to bear the costs of this Court's temporary solution. The defendants are in violation of state and federal laws when sewage runs from their septic system to the Sakonnet River; they have known about this violation since they acquired the land of which the system is located. If defendants had taken steps to achieve a solution earlier, before these suits were filed, they would not have had to bear this cost. It is defendants own flagrant violation of the law that has brought on this financial burden.

H. Defendants Dutra and Alofsin's Motion For Further Hearings Before Issuance of Preliminary Injunction

Defendants Dutra and Alofsin argue that questions concerning their ownership of land under which the sewer pipes run need to be resolved before a preliminary injunction can issue. As demonstrated in Section II, *supra*, these issues are not material to a determination of liability under the Clean Water Acts. The motion is denied.

## VI. PRELIMINARY INJUNCTION

A preliminary injunction is issued against LaRoche, Q.L.C.R.I., and the LaRoche Grantor Income Trust. The Court finds:

1. There is sufficient probability of success by the plaintiffs for this injunction. These defendants are in violation of the federal and state Clean Water Acts, Rhode Island common law of nuisance, and an Order from the Rhode Island Department of Environmental Management. Each of these violations is based on the defendants' release of raw sewage from their septic system into the Sakonnet River without a permit. These laws require the defendants to cease discharging pollutants into the navigable water.

2. If the pollution is allowed to resume flowing until a permanent solution is found and constructed, irreparable harm will result to the plaintiffs and the public. The health hazards, which have been demonstrated by testing for the coliform bacteria and which are testified to by the closing of the River to shellfishing and swimming, are too great. There is no potential irreparable harm to the defendants.

3. The defendants knew of these violations before they bought the property containing the failed septic system in 1986, and they made no, or minimal, efforts to correct the situation until these suits were filed. The defendants have executed two paper land transactions that have reduced the equity in their land on which the septic system is located by over $2 million. Transcript of Hearing, March 1, 1990, at 27–29. Although this money went to the defendants, none of it has been used to correct the noxious situation their failed septic system is causing.

IT IS THEREFORE ORDERED THAT:

1. The defendants shall pump or otherwise remove sewage as needed from the holding tanks installed in early March 1990 on the property of Q.L.C.R.I., Inc., in the Sherwood Village development in the town

of Portsmouth, Rhode Island. The sewage thus pumped is to be transported to appropriate disposal facilities. Such pumping must prevent the discharge of pollutants into the Sakonnet River or the backing up of sewage in the sewer lines leading to the holding tanks.

2. The Attorney General shall pledge the state's credit as bond in the amount of $150,000 during the pendency of this restraining order.

3. Pursuant to Rhode Island Gen.Laws § 46–12–22, the Attorney General, the Director of the Department of Environmental Management, and their agents, while in the performance of their duties, may, at all reasonable times enter the premises, plant or equipment belonging to Q.L.C.R.I.

## VII. CONCLUSION

For the reasons stated above, defendant Q.L.R.C.I. is in violation of the state and federal Clean Water Act, the 1979 Order of the Department of Environmental Management, and the common law of public nuisance. Defendant David LaRoche is in violation of the federal Clean Water Act. The claim against defendants Dutra and Alofsin under the federal Clean Water Act is dismissed. A preliminary injunction is entered against defendants Q.L.C.R.I. and LaRoche. A hearing will be held on defendant Q.L.C.R.I.'s motion for a preliminary injunction against the Homeowners in Sherwood Village. This hearing will take place following the completion of the trial presently before this Court (*Beiser v. Jamestown Boat Yard*). Counsel should notify this Court forthwith as to all matters that are still pending in this case.