**FRIENDS OF THE SAKONNET, et al.**

v.

**Bernard R. DUTRA, et al.**

v.

**Paul D. & Judy COOKINGHAM, et al.**

**James E. O'NEIL, et al.**

v.

**Q.L.C.R.I., INC., et al.**

v.

**Paul D. & Judy COOKINGHAM, et al.**

**C.A. Nos. 88–0704 P, 88–0705 P.**

United States District Court,
D. Rhode Island.

Sept. 14, 1990.

Gerald J. Petros, Hinckley, Allen, Snyder & Comen, Providence, R.I., for Suffield Bank.

Charles P. Messina, Kendra Beaver, Dept. of Environmental Mgt., Providence, R.I., Timothy M. Boudewyns, Portsmouth, R.I., Betsy Grossman deLeiris, Newport, R.I., for plaintiffs.

John Voorhees, Tillinghast, Collins & Graham, Providence, R.I., for Davisville Credit Union.

Stephen B. Lang, Providence, R.I., for P. Alan Ryan.

Barry Kusinitz, Martin W. Aisenberg, Temkin & Miller, Providence, R.I., for La-Roche, Q.L.C.R.I. LaRoche Grantor Trust.

James L. Paradise, Middletown, R.I., pro se.

Thomas H. Quinn, Jr., Providence, R.I., for Dutra and Alofsin.

Michael Rubin, Asst. Atty. Gen., Providence, R.I., for State.

S. Paul Ryan, East Providence, R.I., for Save the Bay, Inc.

Kenneth R. Tremblay, Tremblay & Gordon, Portsmouth, R.I., for Edward & Norma DeArruda.

Matthew Medeiros, Flanders & Medeiros, Providence, R.I., for third party defendants.

William Chaika, Chaika & Chaika, Cranston, R.I., for Carolyn Rose and Paul Buff.

## OPINION

PETTINE, Senior District Judge.

This case is now before this Court on a motion for a preliminary injunction by defendants/third-party plaintiffs David LaRoche, Q.L.C.R.I., Inc., and the LaRoche

Grantor Income Trust (collectively Q.L.C.R. I.). Q.L.C.R.I. seeks an injunction ordering the third-party defendants, the present homeowners and lot owners in the Sherwood Park development, to reimburse Q.L.C.R.I. for the cost of pumping sewage in Sherwood Park under this Court's temporary restraining and preliminary injunction orders, to pay for all future pumping, and to assume responsibility for the design and construction of any new sewage treatment system that this Court may order. Hearings were held on this motion on June 18 and 20, 1990; the parties filed post-hearing briefs and reply briefs. This Court toured the Sherwood development on June 20.

For an outline of the procedural history and the pollution issues present in this case, see this Court's earlier decision at 738 F.Supp. 623 (D.R.I.1990) (cited below as *Friends of the Sakonnet*).[1] The motion now before this Court presents one question: who is responsible for the maintenance, repair, and now replacement of the sewerage system serving the Sherwood development? The question required further findings of fact by the Court, and hearings were held for this purpose in June. The findings are set forth below.

A sewerage system that has daily released thousands of gallons of untreated sewage into the Sakonnet River has provoked this litigation. The private sewerage system was built in the middle or late 1950s to serve the Sherwood Park development in Portsmouth, Rhode Island; it failed completely by 1969. The raw sewage from the failed system flowed into the Sakonnet River from at least 1969 to March 5, 1990, when this Court ordered Q.L.C.R.I., the owner of the land on which the failed system sits, to install and pump as necessary temporary holding tanks for the sewage. However, Q.L.C.R.I. asserts that it is not responsible for the failed system and should not be required to pay for the steps necessary to prevent further pollution of the river. According to Q.L.C.R.I., the homeowners in Sherwood have

easements across Q.L.C.R.I.'s land to deposit their sewage into the treatment system; as dominant tenement holders, the homeowners are required to maintain their easement, and thus the sewage treatment system. Further, the developers of Sherwood Park, to whom Q.L.C.R.I. is a successor-in-interest, did not assume the obligation to maintain the system; even if they had, this obligation was personal to the developers and cannot run with the land to the developers' successors-in-interest.

The Sherwood homeowners counter this argument by agreeing that they have an easement across Q.L.C.R.I.'s land, but arguing that the usual obligations of the dominant tenement holder have been altered in this case by an agreement between the original homeowners (persons who bought their land in the development directly from the developers) and the developers that the sewerage system would be maintained by the developers. This agreement shifted responsibility for the repair of the system to the developers, and to their successors-in-interest to the land on which the system is located. Further, because the system never functioned properly and caused a nuisance, the homeowners argue that the developers' successors-in-interest are responsible for abating that nuisance under the common law of nuisance.

For the reasons set forth below, this Court finds that the developers of Sherwood and their successors-in-interest retained control of the sewerage system located on their land. This control is irrefutable evidence of an agreement between the homeowners and the developers, at the time of the easement formations, that the developers were responsible for the repair and maintenance of the sewerage system. This Court further finds that this agreement is one that runs with the land and one for which Q.L.C.R.I. had notice; therefore, the agreement is binding on Q.L.C.R.I. These conclusions demonstrate that Q.L.C.R.I. does not have a substantial likelihood

---

1. In this earlier opinion, Q.L.C.R.I. was found liable under the state and federal Clean Water Acts for the pollution that had been flowing into the Sakonnet River from the failed sewerage system that serves Sherwood Park. Q.L.C.R.I. owns the land on which the system is located. As of this time, no penalties have been assessed based on this finding of liability.

of success on the merits of its claim. As a substantial likelihood of success is necessary before a preliminary injunction motion can be granted, the motion is denied.

## I. FINDINGS OF FACT

### A. Background

In 1954 Alex Friedman and Fred Alofsin, an optometrist and an orthodontist respectively, bought a plat along the Sakonnet River in Portsmouth, Rhode Island; they subdivided the western section of this plat to form Sherwood Park. They recorded their plat with the clerk of the town of Portsmouth in 1954. Q.L.C.R.I. Exhibit B. This plat shows that Friedman and Alofsin laid out roads and divided the western section of their land into forty-three lots, each with direct access to one of the roads. Also in 1954, Alofsin and Friedman recorded restrictions on these lots. Q.L.C.R.I. Exhibit A. These restrictions, which had a twenty-five-year life, were limitations on the buyers of lots; there were no affirmative duties or restrictions on the developers. There is no mention of a sewerage system in these recorded restrictions. The restrictions do state that any deed transferring ownership of a lot shall convey no interest in the development's roads (built or to be built) because Friedman and Alofsin intended to retain title to the roads until the town accepted them; the lot buyers only had the right of ingress and egress.

Alofsin and Friedman sold several lots before 1957 when Alex Friedman transferred his interest in the development to his partner Fred Alofsin. More lots were sold before 1962 when Alofsin sold out to Sarfco, Inc., a corporation whose sole asset was the Sherwood development. Fred Alofsin retained a minority interest in Sarfco. Sarfco sold the remaining lots in Sherwood Park before it transferred in 1981 its interest in the six remaining undeveloped sections to Bernard Dutra and Eugene Law-

rence Alofsin (a nephew of Fred Alofsin). Dutra and Lawrence Alofsin sold the property to Q.L.C.R.I., Inc. at the end of 1986. Q.L.C.R.I. owns the land today.[2]

Most of the land in the area of Sherwood is unsuitable for individual septic systems. Fred Alofsin and Alex Friedman were aware of this, and thus decided that they must offer lot purchasers some means by which to dispose of their waste waters, otherwise they would not be able to sell the lots. Transcript of Hearing, June 18, 1990, testimony of Alex Friedman, p. 52; testimony of Fred Alofsin, p. 88. In the mid 1950s Alofsin and Friedman built a sewerage system for Sherwood Park. That system was designed to consist of a series of sewer pipes made of six-inch Orangeburg piping, running under the two major streets of the Sherwood development. These pipes were to join at the eastern edge of the development and then run down a fairly steep grade to a septic tank located on an undeveloped section of Alofsin and Friedman's land near the western bank of the Sakonnet River. The solids would settle out in the tank, and the effluent would then go through a filter system and eventually be transmitted through a chlorinating chamber and discharged through a pipe into the Sakonnet River.

During the late 1950s and the 1960s all the homes built in Sherwood Park tied into this sewerage system. This was accomplished by running a sewer pipe underground from the home to the system's sewer pipe under the subdivision's roads. By 1969, when Sarfco was the developer, this sewerage system had completely failed and raw sewage was flowing from the discharge pipe into the Sakonnet River. Not only were the treatment facilities failing to function, the Orangeburg piping used under the development's roads to conduct the sewage to the treatment facilities was permitting large quantities of ground water to

2. The word "developer" is used in this opinion to refer to those persons or corporations who developed Sherwood Park—Fred Alofsin, Alex Friedman, and Sarfco. Bernard Dutra, Law-

rence Alofsin, and Q.L.C.R.I. are referred to as the "successors-in-interest" to these developers as they have not been responsible for develop-

infiltrate and burden the system.[3] After 1969 the town of Portsmouth refused to grant further building permits for Sherwood because of the failed sewerage system. This situation remained essentially unchanged until March of this year when this Court issued a temporary restraining order, followed by a preliminary injunction, ordering Q.L.C.R.I. to install and pump temporary holding tanks that intercepted the waste waters coming from Sherwood before these waters reached the failed treatment facilities.[4]

### B. The Sewerage System and the Development

Although only a few recorded documents mention a sewerage system in the development, there is no doubt that the sewerage system built by Alofsin and Friedman to serve the Sherwood development was an integral part of the development plan from the beginning, and that the right of each lot owner to tie into the system was understood by those who bought lots and intended to build on those lots. Alex Friedman testified that he "intimated" to buyers that they could connect their waste water disposal to the system (Transcript, pp. 36, 45–46, 47, 49–50), and Fred Alofsin stated in court that he "assumed" all the homes tied in (*id.* at 88). Alofsin and Friedman's construction company even built several of the homes that tied into the system. Furthermore, there had to have been an under-

standing between the developers and homeowners that the homes could be tied to the sewerage system. Tying into the system required each homeowner to install underground piping from his or her house to the center of the street, where the development's sewer lines had been placed. This could not have been accomplished without the knowledge and permission of the developers. Homeowners were granted easements to the sewerage system while the development was owned by Fred Alofsin and Alex Friedman, by Fred Alofsin, and by Sarfco.

Although only a few lot buyers apparently obtained written permission to tie into the sewerage system, all the homes built in the development before 1969 did tie in. The few written agreements between developers and homeowners show that the developers did not grant the right to tie into the sewerage system in a consistent manner. The first homeowner in Sherwood agreed to pay a one-time fee for tying into the system,[5] while the developers apparently granted, in writing, the right to two other homeowners without asking for any payment. Further, the written documents and the testimony demonstrate that the developers also did not have a consistent plan for maintenance fees. However, the developers never attempted to collect maintenance fees for the homeowners' use of the system.[6]

---

ing the Sherwood subdivision, although they clearly purchased their land in order to develop.

**3.** This Orangeburg piping, which consists of paper impregnated with asphalt, has today eroded to the point that there may be no bottom portion of the pipe. *See* Transcript, testimony of John Caito, p. 114.

**4.** In 1979, the discharge pipe leading from the treatment facilities to the Sakonnet failed, resulting in raw sewage flowing over land to the river. This was corrected by the town of Portsmouth, which billed Sarfco for the repairs.

**5.** The homeowner and the developers disagree over whether any fee was paid. However, there is no evidence that, if the fee as not paid, the developer made any effort to collect it.

**6.** Three written agreements in which the developers grant lot purchasers the right to tie into the sewerage system have been placed in evi-

dence. The first, a document executed in 1954 by Alex Friedman and Fred Alofsin and by James and Margaret Reynolds, granted the Reynolds permission to tie into a sewerage system Alofsin and Friedman intended to construct. This document says that all owners of lots in Sherwood would have the privilege of tapping into the system upon payment of $500 to Alofsin and Friedman for the right to connect, plus $10 annually for maintenance. This document was not recorded. *See* Q.L.C.R.I. Exhibit C. In the second agreement, contained in the 1958 deed to Joseph Ferri's lot, Fred Alofsin gave Ferri permission to tie his lot into the system without cost; however, the agreement did not "govern the charge, if any, for the processing" of the sewerage. The deed was signed and recorded. *See* Homeowners' Exhibit 1. The third agreement, signed and recorded in 1965 by Manuel Medeiros and Sarfco, grants Medeiros permission to tie into Sarfco's sewerage system with the provision that "all owners"

Although Alofsin and Friedman testified that their intention was eventually to turn over the ownership and management of the sewerage system to a corporation owned by the homeowners and that the homeowners knew this (Transcript, testimony of Alex Friedman, pp. 25, 38; testimony of Fred Alofsin, pp. 60–61), neither they, nor any of their successors-in-interest, ever deeded the system or the land containing the system over to another. The developers granted easements to the homeowners from 1954 until 1969. Signed and recorded documents show that the developers and their successors-in-interest did retain possession of easements and executed licenses that benefited the sewerage system on their land. *See* Homeowners' Exhibits 2, 13.

### C. Adequacy of the Sewerage System

Certainly, the intention of Alex Friedman and Fred Alofsin was to build a working and adequate sewerage system for Sherwood Park. However, this Court finds that Friedman and Alofsin constructed a system that was inadequate when built and certainly inadequate when thirty-three homes were connected to that system. The homeowners were not informed that the system was inadequate, rather, they believed that they were tying into a working system that could handle their needs. Further, the system was not maintained after it was built.

The evidence presented to this Court at the hearings on June 18 and 20, 1990, supports the contention of the homeowners that the sewerage system as designed for Alofsin and Friedman was never completed as chlorination was never provided. Alex Friedman testified that he and Fred Alofsin had planned to install a chlorinator, but never did, and that the system was never completed while he had an interest in the development. Transcript, pp. 21, 38, 45. Fred Alofsin contradicted Friedman when he testified that the system was completed in the mid to late 1950s. However, when the system was inspected in 1959 by an engineer from the Department of Health, the engineer noted that chlorinators were

not hooked up. Q.L.C.R.I. Exhibit AA. There are no chlorinators on the grounds of the treatment facility today. Transcript, testimony of John Caito, pp. 98–100.

The inadequacy of the Sherwood system was reported by a knowledgeable observer as early as 1959. A Department of Health engineer noted in that year that the system, as it was then, could not obtain the approval of the Department, although Alofsin wanted to make changes "within financial reason" to get the Department's approval. Q.L.C.R.I. Exhibit AA. A Health Department memorandum prepared in 1969 reported that the system installed at Sherwood Park was inadequate and could not be approved by the Department. "Therefore, the town officials were advised in 1959, before the houses were built, not to issue building permits for houses on this subdivision until municipal sewers were available; however, the building permits were apparently issued by the town. After the houses were built and occupied, the sewage disposal system failed, resulting in the discharge of improperly treated sewage into the Sakonnet River.... The town was advised again on May 1, 1969 not to issue additional building permits in this subdivision because of the inadequate means of disposal of sewage. The owners of this subdivision have been requested to abate this pollution by the installation of adequate treatment facilities." Q.L.C.R.I. Exhibit FF.

The inadequacy is further documented in a report prepared in 1969 by Stanley Engineering, Inc., of East Providence, Rhode Island, for Sarfco. That report attributes the failure of the sewerage system to the size and type of pipe used in the system (6″ Orangeburg pipe), as well as the use of sump pumps by the homeowners and to the lack of any method to collect and divert surface water. The report described the pipes in the system as in poor condition and the manholes accessing the pipes as "spaced a great distance apart." Q.L.C.R.I. Exhibit GG. The report also states that the "existing collection system has failed a great number of times in the past."

will contribute equally to the cost of any repairs. *See* Q.L.C.R.I. Exhibit R.

Q.L.C.R.I.'s expert, John Caito, testified at hearings before this Court that the system probably failed because of little maintenance and an overload of groundwater infiltration. There has been no evidence presented that there was ever any maintenance performed on the system.

The Orangeburg pipe used in the sewerage system certainly contributed to the inadequacy of the system. It was criticized by both Q.L.C.R.I.'s expert and the expert for the homeowners. The homeowners' expert said the pipe was substandard at the time it was installed and that 8″ pipe of higher quality material was needed. Transcript, testimony of Phillip Virgadamo, p. 177. Q.L.C.R.I.'s expert said the use of Orangeburg pipe was common in the 1950s, but that as employed in the Sherwood sewerage system—as sewer pipes under a roadway—its use was "an exception to the rule." Transcript, testimony of John Caito, p. 103. It is clear from the testimony that the piping broke down rapidly after being installed and is primarily (in combination with a design that did not take ground water run-off into consideration) to blame for the overload of the system.

From the evidence presented, this Court concludes that the sewerage system as designed, built, and maintained was inadequate. Substantial support for this conclusion comes from the fact that the system was never completely operational as chlorinators were not utilized. Further, the system as designed and built did not meet the standards of the Rhode Island Department of Health in the late 1950s, and the developers were unwilling to spend the money needed to obtain this approval. The six-inch Orangeburg piping used in the system, although commonly used in the 1950s, was a poor choice, even in the 1950s, for sewer piping under a roadway. This lack of care or desire for cost cutting that resulted in the choice of Orangeburg piping of only six inches contributed greatly to the inadequacy of Sherwood's sewerage system. The failure to maintain the system negated any

chance the sewerage system had to function adequately.

■ Q.L.C.R.I. argues that the system cannot be deemed inadequate because it functioned until 1969, fifteen years after the first design date on the plans for the system. This assertion ignores several significant details. First, the system was in complete failure in 1969 (*see* Q.L.C.R.I. Exhibits DD and GG), which indicates to this Court, and to engineers who inspected the system in 1969, that the system began to fail long before this. Further, the sewerage system was, at least implicitly, represented as being able to handle the needs of Sherwood Park. However, the system failed within a few years of the time when most of the homes in the development were built, and at a time when a quarter of the lots were still undeveloped. The sewerage system was clearly incapable of handling the sewerage needs of the development from the beginning.

### D. Ownership of Property Within Sherwood Park

■ Q.L.C.R.I. has asserted that the town of Portsmouth owns Sherwood Drive from East Main Street (outside the development) to the Sakonnet River and thus is responsible for the pipes under that street; it has introduced the minutes of a 1960 town meeting at which Sherwood Drive was added to the town's highway system. However, this Court will make no findings concerning the ownership of the streets within the Sherwood development by the town of Portsmouth. The town was not named in Q.L.C.R.I.'s motion for preliminary injunction and did not participate in the hearings on this motion.[7] A finding that Portsmouth owned any of the development's streets, and thus the sewer pipes below the streets, could have serious legal and financial ramifications for the town. Further, it is not clear to this Court that the town's annexation included the part of Sherwood Drive that was only a dirt road

7. The town was named as a third-party defendant in the defendants' cross-claim; however, since the filing of this preliminary injunction motion, the town has been granted summary

judgment on all the claims asserted against it in the cross-claim. *See Friends of the Sakonnet,* 738 F.Supp. 623.

below the development at the time of annexation. Bernard Dutra and Lawrence Alofsin granted an easement to that portion of Sherwood Drive in 1986, indication that they owned the road; and there was speculation by a witness at this Court's June 18 hearing that the town may have abandoned this part of the street, if it ever belonged to the town. Transcript, testimony of John Caito, pp. 151–52. It would be premature and inappropriate for this Court to make a determination of ownership for these streets.

It can be said, however, that Q.L.C.R.I., and before it Bernard Dutra and Lawrence Alofsin, never owned the streets in the developed part of Sherwood Park. Sarfco sold Dutra and Lawrence Alofsin six distinct parcels of land that lie below the lots of the homeowners. The only street running through these lands is the lower portion of Sherwood Drive. See Q.L.C.R.I. Exhibits E, F, G, H, I. Although Sarfco intended to convey all it owned to Dutra and Alofsin, Sarfco may have owned the streets within the developed area of Sherwood Park,[8] and these were not transferred by the deed to Dutra and Alofsin. See Homeowners' Exhibit 15; Q.L.C.R.I. Exhibit E.

There is no dispute that Q.L.C.R.I. owns the land upon which the failed treatment facility lies.

## II. ANALYSIS: EASEMENT LAW

### A. Generally

■ The parties agree that the homeowners have an implicit easement to deposit their waste waters into the sewerage system on Q.L.C.R.I.'s land. Thus, under the law of easements the homeowners have a dominant tenement in Q.L.C.R.I.'s land traversed by the easement, and Q.L.C.R.I. has a servient tenement. The basic relationship between these two tenement holders has been expressed often in Rhode Island case law:

It is well established that where the easement is created by grant and is not

limited in its scope by the terms of the grant, it is available for the reasonable uses to which the dominant estate may be devoted. It is also well established: "The right of the easement owner and the right of the landowner are not absolute, irrelative, and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both. It has been held that the rights of the owner of the easement are paramount, to the extent of the grant, to those of the owner of the soil, and it is an established principle that the unrestricted grant of an easement gives the grantee all such rights as are incident or necessary to the reasonable and proper enjoyment of the easement." 17 Am.Jur., Easements, sec. 96, p. 993.

*Sharp v. Silva Realty Corp.*, 86 R.I. 276, 134 A.2d 131, 136 (1957). *See also Vallone v. City of Cranston, Dept. of Public Works*, 97 R.I. 248, 197 A.2d 310 (1964); *Darby v. Town of Coventry*, 86 R.I. 478, 136 A.2d 678 (1957), *reh'g denied* 86 R.I. 478, 137 A.2d 527 (1958). *Vallone* has further stated the rights of the servient tenement holder:

[T]he owner of land upon which a right of way has been granted to another may himself make such use of the portion of the land so burdened as will not serve to impair or diminish an effective use thereof by the owner of the easement.

197 A.2d at 315.

■ Although the Rhode Island Supreme Court has not specifically addressed the question of whose duty it is to maintain and repair an easement, it certainly would adhere to the rule followed in many jurisdictions:

The duty of maintaining an easement so that it can perform its intended function rests on the owner of the easement absent any contrary agreement. 2 G. Thompson [Commentaries on the Modern Law of Real Property (1980 Replacement)], sec. 428, p. 666. The owner

---

**8.** The deeds transferring ownership between Alex Friedman and Fred Alofsin, and between Fred Alofsin and Sarfco transferred the entire Sherwood plat minus the lots previously conveyed. See Q.L.C.R.I. Exhibits K, D.

must maintain the easement so as to prevent injury to the servient estate. *Powers v. Grenier Construction, Inc.,* 10 Conn.App. 556, 524 A.2d 667, 669 (1987). *See also Walsh v. United States,* 672 F.2d 746, 749–50 (9th Cir.1982) (there is common law privilege and duty of owner of easement to repair and maintain easement absent agreement otherwise). This rule follows logically from the Rhode Island rule that the owner of the servient tenement may use the land upon which the easement lies, however, the servient holder cannot "materially impair or unreasonably interfere with" the use by the dominant tenement holder. *Darby,* 136 A.2d at 681. Rhode Island law only requires that the servient tenement holder not interfere with the easement owner's rights; it does not require the servient tenement holder to assure or promote the use of the easement by the dominant tenement holder. It follows that the state also would not require the affirmative acts of maintenance and repair absent an agreement to the contrary.

With the law as just stated, and apparently agreed to by the parties, two questions need to be answered in order to establish liability for the repair of the Sherwood sewerage system under easement law. First, was there an agreement or a covenant between those who initially tied into the system and the developers that the developer would maintain and repair the system? If there was no agreement, the homeowners are responsible, under the law of easements, for the repairs now needed. However, if there was such an agreement, the question remains whether that agreement and the duty it imposed was personal to the original developers and the original home builders, or whether the agreement is such that it runs with the land and binds subsequent owners who are in privity with the original parties to the agreement.

## B. Presence of an Agreement

■ Under Rhode Island law the question of whether a grant of an easement arises by implication depends on the intent of the parties. *Kusiak v. Ucci,* 53 R.I. 36, 163 A. 226 (1932). That intent, when implied from a written document, must be determined by examining all the circumstances surrounding the claimed formation of the easement, as well as the subsequent conduct of the parties to the agreement. This same analysis is used when the *terms* of a written grant of an easement are ambiguous. *See id.; Waterman v. Waterman,* 93 R.I. 344, 175 A.2d 291 (1961); *Robidoux v. Pelletier,* 120 R.I. 425, 391 A.2d 1150 (1978). In the present case, the existence of implied easements is not questioned; what is questioned are the *terms,* if any, of the easement agreements. Therefore, this Court will use the analysis used by the Rhode Island Supreme Court to determine ambiguous or unclear terms in a grant of a written easement: both the circumstances surrounding the formation of the easements between developer and homeowner and the subsequent conduct of these parties will be examined in order to determine if the parties intended that any terms qualify the grants of easements, and if terms were intended, what these terms were.[9]

■ An examination of the circumstances surrounding the formations of these easements must begin with the agreement signed by the Reynolds and

---

9. Q.L.C.R.I. argues that because most of the homeowners have no written agreements and the few who do have written agreements all have different agreements, there can be no binding agreement concerning the maintenance of the system. Therefore, Q.L.C.R.I. argues, the common law of easements which requires the dominant tenement holder to maintain the easement should prevail. Although this argument and the simplicity of its solution have appeal, unquestioning acceptance of the argument would be unfair to the homeowners in the Sherwood development. There may have been an understanding about *who* was to repair the sewerage system, even though other aspects of the agreements, such as fees to be collected for the tie-ins and use, do not show a common plan. Q.L.C.R.I. has argued consistently throughout these proceedings that the homeowners have more than a financial responsibility to pay for repairs to the sewerage system, they have the responsibility for the upkeep of the system. The distinctions pointed to by Q.L.C.R.I. in the written easement agreements all deal with financial responsibility, not the duty to make the maintenance and repairs.

Friedman and Alofsin.[10] Although not recorded and certainly not binding on anyone else, it is a reliable indication of the thinking and plans of the two men who had the system built and who granted the first easements. This written agreement accompanied the *first* easement granted and was made at the same time the system was being planned and built. It surely reflected the original intentions of the developers. The agreement with the Reynolds demonstrates that Alofsin and Friedman intended that *all* lot owners would have, for a price, the right to connect to the sewerage system being built. But, more importantly, in this agreement Alofsin and Friedman revealed that they intended to control the maintenance of the system. The agreement demanded $500 for the right to connect to the system, i.e., for the grant of the easement, but it also demanded $10 per year for maintenance. This $10 fee was not to be paid to a fund for the system, but to Alofsin and Friedman, the owners of the servient tenement, so that they could maintain the system.[11]

The two other written agreements between lot purchasers and the developers diverge in their terms from the Reynolds' agreement. Four years after the Reynolds' 1954 agreement, Fred Alofsin included a statement in the Ferri deed that granted Joseph Ferri, Jr. permission to tie into the system gratis, but reserved the right to charge for processing Ferri's sewage.[12] The final agreement was executed in 1965 between Sarfco and Manuel Medeiros.[13] In that agreement Sarfco granted Medeiros permission to tie into Sarfco's sewerage treatment facility, with the caveat that if the facility needed repairs, all homeowners would contribute to the cost of the repairs.[14] Although each of the three separate written agreements states a different monetary obligations for the homeowner, each does make absolutely clear that the developer controls the sewerage system. Any fees to be paid for tie-ins or use would go to the developer.

Beyond the written grants of easements, the circumstances surrounding the formations of the implied easements also demonstrate that the developers have always in-

10. In pertinent part that agreement states: "Whereas, the said James L. Reynolds and Margaret L. Reynolds desire to purchase Lot #34 on said aforementioned plat; whereas, it is the intention of the said Fred R. Alofsin and Alex Friedman to construct a sewerage system on said plat in the future; whereas, the said James L. Reynolds and Margaret L. Reynolds intend to construct a home on said lot before said sewerage system will be constructed; whereas, it will be necessary for said Reynolds's to install a septic tank sewerage system on said lot; whereas, upon construction of said sewerage system all owners of lots on said plat shall have the privilege to tapping into said sewerage system upon payment to the said Alofsin and Friedman of the sum of Five Hundred ($500) Dollars for said right to connect into said sewerage system, plus a Ten ($10) Dollar yearly fee for maintenance." Q.L.C.R.I. Exhibit C.

11. That neither Alofsin and Friedman nor any subsequent developer at Sherwood asked to be paid a maintenance fee is irrelevant to the question of who had the duty to repair and maintain the sewerage system. Certainly, if the developers had collected maintenance fees, their duty could not be questioned; if the developers had the right to demand maintenance fees, but did not, this neglect does not effect the duty.

12. In pertinent part this deed states: "The Grantee herein [Ferri] is hereby given permis-

sion to tie Lot #35 into the private sewerage disposal [system] of Sherwood Park without cost, but nothing herein contained shall govern the charge, if any, for the processing of said sewerage." Homeowners' Exhibit 1.

13. In pertinent part that agreement states: "The Seller [Sarfco] hereby agrees to allow the Purchaser [Medeiros] to tie into its sewerage treatment facility with the agreement, however, that if the sewerage facility needs repairs all owners using the same contribute equally to the cost of said repairs." Q.L.C.R.I. Exhibit R.

14. There is a distinction between the phrase "annual maintenance" in the Reynolds agreement and the word "repairs" in the Medeiros agreement. The former refers to routine work on the system, whereas the latter can refer to as much as a major overhaul of the system. As the Medeiros agreement made no reference to any periodic assessments—which are conventional in sewerage collection—this Court believes that Sarfco was anticipating major work would need to be done on the system. By the time Sarfco made the Medeiros agreement in 1965, even if the sewerage system had yet to fail, Sarfco knew that it owned a system that did not meet Health Department standards and that might be costly to bring up to standard.

tended to control and have actually controlled the septic system on what is now Q.L.C.R.I. land.

■■■■ Control of the system was imperative for the developers; without it, they could not have continued to grant easement to the later home builders. Without the ability to grant easements, the developers could not sell lots. It may be that Sarfco let the system become "useless," as Q.L.C.R.I. argues, but this was not because they had relinquished control of the system to the homeowners through the easement grants. The continued grant of easements to deposit sewage in the development's sewerage system is persuasive evidence of the developers' control of the system.[15] Under easement law, the first homeowners to tie into the system may have been able to exclude later users if the developer had not retained control. Although a dominant tenement holder has only a nonpossessory interest in his or her easement, that easement owner may exclude others from the easement when they interfere with the dominant tenement holder's use of the easement. Restatement of Property sec. 450, comments b and h (1944). Each additional use of the sewerage system by a homeowner granted an easement placed a greater burden on the system and decreased the system's life expectancy. Certainly, if the first easement holders controlled the treatment facility, and thus had the attendant duty to repair and maintain, they could have prevented the additional easement grants. *Cf. Russel v. Palos Verdes Properties*, 218 Cal.App.2d 754, 32 Cal.Rptr. 488 (1963) (where dominant tenement holder increases burden on easement by subdividing servient tenement holder can enjoin such increase). But the early easement holders had no right to prevent the increased burden on their easement; their understanding, and that of the developers, was that the developers controlled access to the system.[16] And the developers *did* control access. The developers retained this right by granting easement that only permitted the homeowners to deposit their waste water into *the developers'* system—an arrangement for which the developers could have charged.[17]

Further evidence of the developers' intention to control the system can be gleaned from the actions of the developers. They negotiated easements and a license for themselves so that they could maintain the sewerage system. In 1958 the Souzas granted an easement to Fred Alofsin, his heirs, and assigns to repair and maintain the discharge pipe from the treatment facility that ran under the Souzas land. Homeowners' Exhibit 2. This easement was renewed in 1986 by Bernard Dutra and Eugene Lawrence Alofsin when they obtained a license from the Souzas to maintain the pipe. Homeowners' Exhibit 13. Each of these documents was worded so that only the developers had the right to the easement or license, there were no provisions or contingencies for anyone other than the developers to maintain and repair a significant part of the sewerage system.

The control expressed in the maintenance easement and license is reinforced by the actions of Sarfco and Q.L.C.R.I. when they each expended funds to hire outside consultants to plan a working sewerage system for Sherwood Park. *See* Q.L.C.R.I. Exhibits GG, HH; Transcript, testimony of John Caito, pp. 117–18. Although these expendi-

15. In fact, an engineering firm commissioned by Sarfco to develop a new sewerage facility designed a system that could accommodate 113 homes—47 from the then developed portion of Sherwood and 66 on the undeveloped land owned by Sarfco. *See* Q.L.C.R.I. Exhibit GG.

16. Generally, under easement law, it is the dominant tenement holder that has the right to subdivide and increase the use of the easement. *See* Restatement of Property sec. 488, comment b.

17. The developers could have set up a "quasi-municipal" corporation within the development to run the system, as both Fred Alofsin and Alex Friedman testified they had intended to, but did not, form. Transcript at 24, 38, 60–61. This would have relieved the developers of control and maintenance responsibilities for the system. The written agreements with the three homeowners prove that no such corporation was ever set up, even by implication; the developers would not have been granting the written easements if the system was controlled by any other person or organization.

tures were at least partially motivated by pressure from lawsuits, they are also persuasive evidence that both Q.L.C.R.I. and Sarfco considered themselves in control of the Sherwood sewerage system.

All the evidence surrounding the formation of the easements and the later actions of the parties to the easement agreements add up to only one conclusion: the developers of Sherwood Park intended to retain control of the sewerage system when they granted easements to the homeowners. Both the developers and the homeowners understood this when the easements were formed. The easements granted by the developers only gave the homeowners in Sherwood the right to deposit their waste waters into the system. Attendant to the control exercised by the developers and their successors-in-interest, is the duty to maintain and repair the sewerage system. They granted easements to a system they represented as adequate to serve Sherwood's lot owners; as the developers controlled the system it was up to them to assure this adequacy. The terms of the easement agreements provided that the developers remained in control of the sewerage system and would provide and maintain an adequate sewerage system for Sherwood Park. This agreement is clear from the circumstances surrounding the formations of the easements and from the subsequent actions of the parties.

 Although the developers retained responsibility for maintaining the system, this Court does not doubt that they could have charged the homeowners maintenance fees for processing their waste waters even though the explicit and implicit easements do not express a consistent understanding about fees. It would be unreasonable for those who tied into the system to expect their sewage to be treated and disposed of, without cost, in perpetuity.[18] The right to tie into the system was apparently part of the lot purchase price for most of the lot owners, but this purchase price did not cover the expenses that any operator of a sewerage system could expect to incur when processing the sewage and maintaining the system. However, the homeowners did not assume the financial responsibility for building the initial adequate system. It would be grossly unfair to demand that the present thirty-three homeowners pay the approximately half million dollars required to replace the existing system. Many of the original lot buyers bought land in Sherwood because they were promised a sewerage system; they expected, and believed they had paid for in the purchase price, an adequate system and a system that would be maintained (whether from assessed fees or otherwise). The homeowners got neither. They should not be asked to pay again when they never received what they paid for the first time. The homeowners have not been charged for waste water disposal, but they have not received anything for free as their sewage was not treated for most of the time.[19]

### C. The Running of the Burden

 The question still remains whether Q.L.C.R.I., which has not sold any lots in Sherwood but is a successor-in-interest to the developers, can be held liable for the cost of replacing the failed sewerage system on its land. Phrased a different way, does the agreement between the developers and the original lot purchasers that the developer will maintain the sewerage system, run with the land, or is the agreement personal and thus valid only between the original parties to the agreement? For this duty of the developers to be binding on the developers' successors-in-interest (a running of the burden), the promise by the developers must be one relating to the use of the land; it must have been made with the intention that the developers' successors-in-interest be bound;

---

**18.** James Murray, a homeowner in Sherwood, stated that he was told when he bought his lot that he would never be charged for maintenance or processing. No other lot purchaser appears to have had this understanding. *See* deposition of James Murray.

**19.** Nor did the use of this easement cost the developers because they never maintained the system.

and the successors-in-interest must have had notice of the promise.

There can be no question that the developers' promise to provide and maintain an adequate sewerage system is one that relates to the use of the land. The promise clearly increased the usefulness of the buyers' land. Without the promise of this system, the land could not easily have been developed for residential use. The use of the land in Sherwood was the primary motivation for the making of the promise. Further, the use of the land contemplated by the promise—as the location of the treatment facility—certainly has the requisite degree of permanency. *See* Restatement of Property secs. 530–538.

The promise made by the original developers that they would provide an adequate, working sewerage system would have been a promise without meaning if those developers did not intend their successors to be bound. The lot purchasers would not have been attracted to Sherwood if the developers could have sold out their interests, and thus the obligation to provide the adequate sewerage system, within a few months or years.

Finally, Q.L.C.R.I. must have had notice of the promises made by the original developers if these agreements are to be enforced against it.[20] Q.L.C.R.I. has admitted that it knew before its purchase that the land contained a sewerage system that had been built by Q.L.C.R.I.'s predecessors-in-interest in order to benefit the lot owners in Sherwood. Q.L.C.R.I. has further acknowledged that when it acquired the property, it knew the previous owners had been adjudged in violation of state clean water laws and regulations because of the failed sewerage system. That judgment had ordered Sarfco to cease polluting the Sakonnet River—an order anyone inspecting the land at the time Q.L.C.R.I. made its purchase could see had not been carried out. Further, Q.L.C.R.I. and its sole stockholder David LaRoche, an experienced businessman, surely knew that the failed system had resulted in restrictions on further building by those desiring to develop the land and that no action had been taken against the homeowners to remedy this situation.

These known facts should certainly have caused David LaRoche, a sophisticated investor, to examine the situation with care. The recorded records dealing with the land Q.L.C.R.I. was purchasing—Q.L.C.R.I. and David LaRoche can be considered to have constructive knowledge of these documents, as well as what is not in these documents—show that Q.L.C.R.I.'s predecessors-in-interest retained control of the sewerage facility. First, there is no deed from Q.L.C.R.I.'s predecessors-in-interest transferring ownership of the treatment facilities to the homeowners in Sherwood. This is solid evidence that the ownership of the facility remains with the owner of the land. Second, as discussed above, all the recorded documents show Q.L.C.R.I.'s predecessors-in-interest retaining control of

---

**20.** The statute of frauds requires that a promise concerning the use of land be in writing and signed by the promisor if it is to be enforceable. *See* Restatement of Property sec. 522. In this case, there are only three such promises in writing and each is different. However, both the oral and written promises can be enforced under the doctrine of estoppel. The original lot purchasers were induced to buy in Sherwood because they were promised a community sewerage system by the developers. The original buyers would not have bought the land (or would have paid a reduced price) if no promises to provide an adequate sewerage system had been made. *See* Transcript, testimony of Alex Friedman, p. 52; testimony of Fred Alofsin, p. 88. This increased value has presumably been passed on to any successors-in-interest of the original buyers. This Court finds that the original purchasers, and eventually their successors-in-interest, reasonably relied upon the developers' promise when they paid for their lots; the doctrine of estoppel requires the developers, and their successors-in-interest if they had notice of the promise, to carry out their promise. *See Shalimar Ass'n v. D.O.C. Enterprises, Ltd.,* 142 Ariz. 36, 688 P.2d 682 (App.1984) (where plaintiffs induced to buy home with representation that neighboring golf course would be maintained, such a restriction comes within the statute of frauds, but will be enforced against a later purchaser of golf course (who had actual and constructive notice of agreement) because previous owners' conduct amounted to estoppel); *Miller v. Lawlor,* 245 Iowa 1144, 66 N.W.2d 267 (1954) (where one landowner acted in reliance on oral agreement not to obstruct view, court enforced agreement). *See also* Restatement of Property sec. 524.

the treatment facility—a control that extends from the Ferri deed in 1958 and the Souza easement in 1958 to the 1986 license agreement with the Souzas made by Q.L.C.R.I.'s immediate predecessors-in-interest. The 1986 Souza agreements should have extinguished any hope that Q.L.C.R.I.'s predecessors-in-interest had relinquished control.

Q.L.C.R.I. had adequate notice that its predecessors-in-interest controlled the Sherwood sewerage system and thus were responsible for the maintenance of the system. This notice makes the agreement of those predecessors-in-interest to maintain the system binding on Q.L.C.R.I.

## III. ANALYSIS: LAW OF NUISANCE

The liability of Q.L.C.R.I. under the law of nuisance depends primarily on the question of control and duty to maintain discussed above. One who controls a nuisance is liable for damages caused by that nuisance. *See Friends of the Sakonnet,* 738 F.Supp. 623; *Henriques v. Rockefeller,* 148 Conn. 654, 173 A.2d 596, 598 (1961); *Keeley v. Manor Park Apartments, Sec. 1, Inc.,* 99 A.2d 248, 250 (Del. Ch.1953). *Cf. City of Manchester v. National Gypsum Co.,* 637 F.Supp. 646 (D.R. I.1986) (because defendant never controlled that which caused nuisance, cannot be held

liable). It does not matter that the one in control did not create the nuisance, as a successor-in-interest who maintains a nuisance, that person is liable for damages caused by the nuisance.[21] *See* Restatement (Second) of Torts sec. 839 (1977). Successors-in-interest can be held responsible for abating the nuisance created by their predecessors.

As demonstrated above, Q.L.C.R.I. and its predecessors-in-interest retained control of the failed sewerage system and had the correlative duty to maintain the system. Any nuisance that the failed system has created is the responsibility of Q.L.C.R.I. and its predecessors-in-interest. This Court has previously determined that the illegal release of pollutants into the Sakonnet River is a nuisance per se, *Friends of the Sakonnet,* 738 F.Supp. 623, and has found Q.L.C.R.I. liable under the Rhode Island common law of public nuisance.[22] Q.L.C.R.I.'s control of the sewerage system makes that corporation and its predecessors-in-interest, not the homeowners releasing their waste waters into the system, responsible for the nuisance caused by the faulty system.[23]

## IV. CONCLUSION

Q.L.C.R.I.'s motion for a preliminary injunction against the homeowners is

21. Q.L.C.R.I.'s predecessors-in-interest are also liable for damages caused by any nuisance created by the failed system. *See Friends of the Sakonnet,* 738 F.Supp. 623; *Keeley,* 99 A.2d at 251 ("while at common law it is the general rule that the owner of land ceases to be liable in negligence for its condition when the premises pass out of his control before the injuries result, this is not the general rule in the case of nuisance").

22. The present homeowners have asserted in a cross-complaint that they have been injured by the nuisance created by the failed sewerage system. That claim is not presently before this Court.

23. The facts of this case are strikingly similar to *Henriques v. Rockefeller,* 148 Conn. 654, 173 A.2d 596 (1953), cited by the homeowners, and the reasoning of the Connecticut Supreme Court is very persuasive. In that case, a sewage system that had been improperly designed and constructed, not maintained, and allowed by the developer to be overloaded had created a nuisance for the homeowners in a development. The defendants and their predecessors-in-inter-

est had sold all the lots in the development and owned no property in the development at the time the suit was filed; however, they had retained control of the sewage system. The Connecticut Court found that it would be unconscionable to allow the defendants to benefit from the sale of the lots and then escape liability for a failed system for which they were responsible. In the present case, Q.L.C.R.I. is not responsible for creating the nuisance, thus the equities in this case are not as clear as in *Henriques.* However, like the homeowners in *Henriques,* the Sherwood owners or their predecessors-in-interest were promised an adequate sewerage system that would be maintained, and they did not get it. Q.L.C.R.I. bought the land knowing there was a failed system intended to serve the Sherwood homeowners; it knowingly assumed the risk of liability for the system (and, presumably, paid a price that reflected this risk). Although the equities may not be as strong as in *Henriques,* in this case they still weight the scales in favor of the homeowners, as does the law.

denied. Q.L.C.R.I. has failed to demonstrate that it has a substantial likelihood of success on the merits of its claim. As discussed above, the control of the sewerage system that has been retained by Q.L.C.R.I. and its predecessors-in-interest dictates that Q.L.C.R.I. is responsible for any nuisance created by the system and is liable under the law of easements for maintaining and repairing the system. Further, Q.L.C.R.I. has made no serious attempt to prove that its continued payment for the pumping required by this Court will cause Q.L.C.R.I. irreparable harm. Monetary outlays that may cause injury are not normally considered irreparable, *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197 (9th Cir. 1980), and in this case a claim of monetary hardship would be particularly hard for this Court to accept in light of the large mortgages Q.L.C.R.I. has taken out on the land after its acquisition. In summary, Q.L.C.R.I. has failed to show either that there is a possibility of irreparable injury to itself or that it has a strong likelihood of success on the merits of its claims. Any balancing of interests and possible damages to each party does not weigh in Q.L.C.R.I.'s favor. The preliminary injunction is denied.