**COGGESHALL DEVELOPMENT CORP. and Coggeshall Marina, Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 90–3942L.**

United States Court of Federal Claims.

Sept. 1, 1993.

---

James M. Sloan, III, Providence, RI, attorney of record for plaintiffs. Gardner, Sawyer, Gates, Sloan & Engustian, of counsel.

Andrew M. Eschen, Washington, DC, with whom was Asst. Atty. Gen. Richard B. Stewart, for defendant. Anthony M. Dowdle, Dept. of the Navy, of counsel.

## OPINION

FUTEY, *Judge.*

This contract case is before the court after a trial on the merits. Plaintiffs are successors-in-title to Navy surplus real property and seek compensation from defendant for the alleged violation of the terms of the property's deed. Defendant counters that it has not violated the deed's terms as the original contracting parties intended the terms to be read.

### *Factual Background* [1]

Plaintiffs, Coggeshall Development Corporation (Coggeshall Development) and Coggeshall Marina, Inc. (Coggeshall Marina), are Rhode Island business corporations. Defendant is the United States, acting through its agent, the United States Navy (Navy). The deed at issue concerns real property in Rhode Island that has

---

1. The court has detailed the facts of this case in two prior opinions. *See Coggeshall Dev. Corp. v. United States,* No. 90–3941L, Unpublished Opinion (Cl.Ct. February 2, 1993); *Coggeshall Dev. Corp. v. United States,* 23 Cl.Ct. 739 (1991). The present opinion discusses only those facts relevant to the issues presented at trial.

changed hands several times and to which plaintiffs are the current successors-in-title.

In the early 1970's, the United States government announced that it was planning to reduce the size and scope of operations of the Navy at the Newport Naval Base in Newport, Rhode Island. In 1974, as a result of this restructuring, the Navy declared certain real property, located in nearby Portsmouth, Rhode Island, excess to its needs and transferred the property to the General Services Administration (GSA) for disposition. GSA subsequently determined that the land was surplus to the needs of the United States and offered to sell it to the Rhode Island Port Authority and Economic Development Corporation (RIPA), an agency of the State of Rhode Island created to acquire surplus land of the United States for economic development purposes.

At approximately the same time that GSA was negotiating with RIPA to sell the surplus land to the State of Rhode Island, a private company known as Bend, Inc. (Bend), presented RIPA with a proposal to use approximately 28.8 acres of that land, located in an area now known as the Bend Boat Basin, to run a marina. RIPA approved the Bend project and on February 1, 1978, executed a "Site Lease Agreement" with Bend. Under that instrument, RIPA, as lessor, agreed to lease the 28.8 acres to Bend, as lessee, for an initial term commencing on February 1, 1978, and running through January 31, 1993. RIPA also granted Bend an option to purchase the property at the end of the initial term.

On February 13, 1978, GSA conveyed to RIPA two parcels of its surplus property totalling approximately 28.8 acres. The deed from GSA to RIPA (GSA deed) provides, in relevant part, that:

[T]he UNITED STATES OF AMERICA, acting by and through the ADMINISTRATOR OF GENERAL SERVICES, under and pursuant to the powers and authority contained in the provisions of the Federal Property and Administrative Services Act of 1949 ... as amended ... grants to the RHODE ISLAND PORT AUTHORITY AND ECONOMIC DE-VELOPMENT CORPORATION ... two certain parcels of land ... shown as Parcel 1 and Parcel 2 on a Plan attached hereto and made a Part hereof, entitled "BEND, INC. BOAT BASIN MELVILLE PORTSMOUTH RHODE ISLAND...." The Grantor hereby grants to Grantee all sewer lines located within said Parcels 1 and 2, along with the perpetual and assignable right to connect at the boundary of Grantee's property with certain sewer mains owned by Grantor and located on other land of Grantor. Grantor covenants that it will maintain its sewer mains and appurtenances which connect sewer lines in the fee area to the City of Newport's public sewer system. The Grantee by acceptance of this Deed covenants that it shall pay the pro-rata costs (based on use) of maintaining Grantor's connecting system resulting from Grantee's use thereof, direct charges assessed to Grantee by the furnishing utility or entity; provided that Grantor's obligation to maintain the same shall terminate at such time as such sewer service shall become available to Grantee by a public utility, without utilizing sewer lines then owned by Grantor; and provided that Grantee's obligation to pay the pro rata costs of maintaining Grantor's connecting sewer system shall terminate upon Grantee obtaining such public utility service. Grantee shall be allowed a reasonable time to obtain such public utility sewer service after same shall become available.

In addition, the GSA deed states the following with respect to successors-in-title and subsequent assignment by RIPA:

Wherever in this Deed reference is made to the Grantor or Grantee, the same shall be read and construed so as to include the successors in title and assigns of both Grantor and Grantee, as well as any person, firm or entity claiming by, through or under said Grantor or Grantee, and their respective successors in title and assigns.

All covenants and agreements as are herein contained in this Deed, whether made by Grantor or Grantee, shall be

deemed and shall constitute covenants running with the land, and shall be binding upon the successors in title and assigns of both Grantor and Grantee, and those claiming by, through or under either of them, including without limiting the foregoing generality, estates for a term of years except that the covenants and agreements of the Grantor shall cease to run with the land if the same shall have lapsed as aforesaid.

On February 27, 1978, pursuant to the Bend–RIPA Site Lease Agreement, Bend, as sublessor, entered into a sublease with Tillotson–Pearson, Inc. (TPI), in order to implement the Bend marina project. The sublease provides, in relevant part, that "BEND is the tenant of [the 28.8 acres constituting the 'Parcel'] pursuant to a certain Site Lease Agreement ... [with RIPA] ..." and that it was subletting to TPI certain premises thereon. The sublease defined the term "Parcel" as the entire 28.8 acres that RIPA had acquired from GSA and which it had leased to Bend under the Site Lease Agreement. The sublease between Bend and TPI was recorded in the Portsmouth Records of Land Evidence on February 28, 1978.

On May 1, 1986, Bend was approached by Thomas McLaughlin, the President of Woodman Development Corporation (Woodman), a Boston-based company that expressed interest in acquiring Bend's property interests. Woodman incorporated Coggeshall Development in August 1986, and Coggeshall Marina in December 1986, in order to acquire Bend's interests.

In the fall of 1986, upon Bend's request, RIPA agreed to accelerate Bend's option to purchase the 28.8 acres under the Site Lease Agreement. On December 5, 1986, Bend and RIPA entered into a Purchase and Sale Agreement under which RIPA agreed to sell the property to Bend.

Also on December 5, 1986, Thomas McLaughlin, on behalf of Coggeshall Development, entered into a mortgage agreement with Bend. Under this agreement, Bend was the mortgagor, Coggeshall Development was the mortgagee, and the Bend–RIPA Site–Lease was the mortgaged property. The mortgage instrument stated that it was subject to the earlier recorded sublease between Bend and TPI.

Under the terms of the Purchase and Sale Agreement between Bend and RIPA, the 28.8 acres were to be conveyed to three separate nominees: TPI was designated the grantee of a 3.9 acre and 4.6 acre parcel; Coggeshall Development was designated the grantee of an 11.8 acre parcel; and Coggeshall Marina was designated the grantee of an 8.5 acre parcel.

On December 30, 1986, under two separate deeds, RIPA transferred 11.8 acres and 8.5 acres of the 28.8 acre parcel to Coggeshall Development and Coggeshall Marina, respectively. Both deeds indicate that "[c]onveyance is made SUBJECT TO (i) those reservations, restrictions, easements, covenants and limitations imposed upon the granted premises and upon the rights and easements appurtenant thereto by the [GSA deed]."

Plaintiffs' property is located within the Town of Portsmouth, which does not own or operate a municipal sewage treatment plant. The Navy occupies property adjacent to plaintiffs' property. The sewer line on plaintiffs' property is connected to a sewer line owned by the Navy at the property line that plaintiffs share with the Navy. The Navy's sewer line traverses the Navy's property and ultimately connects at the Newport Treatment Facility (Newport Facility) in Newport. The sewer line from plaintiffs' property to the Newport Facility extends approximately 6 miles. Because plaintiffs' property is not within the territorial boundary of Newport or Middletown, plaintiffs have no independent right to obtain sewage service from the Newport Facility. No municipal sewer system is currently available to directly or indirectly service plaintiffs' properties.

Plaintiffs sought to construct residential condominiums in the Bend Boat Basin property. They requested the Portsmouth Planning Board (Board) to zone a portion of the property for residential use and submitted to the Board a model for their proposed

development.[2] The Board invited the Navy to comment on the proposal. The Navy informed the Board that it had imposed a 12,000 gallon per day (gpd) limitation on sewage discharge from the Bend Boat Basin area into the Navy's sewer system, that sewer utilities into the Bend Boat Basin area could support only this existing limitation, and that the Navy's sewer system would not accommodate additional sewage service from the proposed subdivision. GSA subsequently adopted the Navy's position. Plaintiffs, thereupon, requested the Navy and GSA to reconsider this decision and to allow plaintiffs to discharge 72,000 gpd of effluent into the Navy's sewer system. Their request for reconsideration was denied.

Plaintiffs brought suit in the United States District Court for the District of Rhode Island seeking injunctive relief "to enforce the contractual easement rights granted them by the United States in the [GSA deed]." *Coggeshall Dev. Corp. v. William J. Diamond, Administrator of General Services Administration*, C.A. No. 88–0448B, slip op. at 13 (D.R.I. Dec. 22, 1988). The district court granted judgment in favor of plaintiffs and ordered that the Navy allow plaintiffs to tie into its sewer system for up to plaintiffs' requested total amount of 72,000 gpd of discharge. *Id.* at 17. On appeal, the United States Court of Appeals for the First Circuit vacated the district court's decision after determining that the Claims Court,[3] not the district court, was the proper forum for plaintiffs to litigate their breach of contract claim. *Coggeshall Dev. Corp. v. William J. Diamond, Administrator of General Services Administration*, 884 F.2d 1, 4–5 (1st Cir. 1989).

On November 13, 1990, plaintiffs filed suit in this court, seeking $25 million in damages against the government for the alleged breach of the GSA deed covenant. Defendant filed a motion on January 11, 1991, to dismiss the action for failure to state a claim upon which this court could grant relief. Defendant averred that plaintiffs lacked standing to sue the government for breach of the GSA deed covenant.

On August 22, 1991, the court denied defendant's motion to dismiss. *Coggeshall Dev. Corp. v. United States*, 23 Cl.Ct. 739 (1991). In its decision, the court held that: (1) plaintiffs have standing to pursue their contract claim in this court because, as successors-in-title to the property that RIPA purchased from the United States, plaintiffs have a contractual relationship with the United States, and (2) by alleging that the government breached its contract with plaintiffs, plaintiffs have stated a claim upon which this court can grant relief.

On February 25, 1991, plaintiffs filed a motion for summary judgment as to liability in this court. Defendant filed its opposition and cross-motion on February 28, 1992. On February 2, 1993, the court denied plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. *Coggeshall Dev. Corp. v. United States*, No. 90–3942L, Unpublished Opinion, (Fed.Cl. February 2, 1993). The court held trial on June 7–9, 1993.

### Discussion

The dispute in the present case regards the level of sewer service that the Navy must supply to plaintiffs' property under the terms of the GSA deed. The GSA deed is silent on the scope of the Navy's obligation to provide sewer service. Two ques-

---

**2.** During the period that the 28.8 acre parcel had been owned by Navy and by the Rhode Island Port Authority (RIPA), it was exempt from the application of the Portsmouth zoning ordinances. When RIPA conveyed the property to plaintiffs, it became subject to the Portsmouth zoning ordinances. At the time that plaintiffs acquired the property, the Portsmouth Town Council had not given the property a particular zoning classification. Transcript (Tr.). at 129.

**3.** On October 29, 1992, the United States Claims Court was renamed the United States Court of Federal Claims, pursuant to Title IX of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992). The United States Court of Federal Claims is the successor to the United States Claims Court in all respects.

tions were presented at trial: (1) whether the original parties to the GSA deed—RIPA and GSA[4]—intended the GSA deed to be a final, integrated document; and (2) if RIPA and GSA did not intend the GSA deed to be a final, integrated document, then what terms did RIPA and GSA intend to read into the GSA deed regarding the amount of sewage that the Navy was to allow RIPA and its successors-in-title to discharge into the Navy's sewer system. *See Coggeshall Dev. Corp. v. United States,* No. 90–3942L, Unpublished Order (Fed.Cl. Feb. 19, 1993).

### 1. *GSA Deed's Completeness*

■ Defendant maintains that the GSA deed is incomplete because it fails to address how much sewage service that the Navy must provide to RIPA's property. Defendant alleges that, prior to executing the GSA deed, RIPA, GSA, and the Navy orally agreed to limit effluent discharge from RIPA's property into the Navy's sewer system to 12,000 gpd. Defendant concludes that this extrinsic agreement shows that the parties did not intend the GSA deed to completely encompass their agreement. Plaintiffs, on the other hand, contend that the GSA deed is complete. They allege that RIPA and GSA did not include a specific sewage discharge limit in the GSA deed because the Navy intended to grant RIPA and its successors-in-title an easement of unlimited reasonable use.

■ In determining whether RIPA and GSA intended the GSA deed to be a final, integrated document, the court may consider both the document itself and evidence extrinsic to the writing, including the circumstances surrounding the document's execution, including the parties' negotiations preceding the document's execution and the parties' conduct subsequent to the agreement's formation. *David Nassif Assocs. v. United States,* 557 F.2d 249, 214 Ct.Cl. 407, 420 (1977); *Sylvania Elec. Prod., Inc. v. United States,* 458 F.2d 994, 198 Ct.Cl. 106, 128 (1972); *Friends of the Sakonnet v. Dutra,* 749 F.Supp. 381, 389 (D.R.I.1990); *Robidoux v. Pelletier,* 120 R.I. 425, 391 A.2d 1150 (1978); *Waterman v. Waterman,* 93 R.I. 344, 175 A.2d 291, 294 (1961).[5]

Based on the documentary and testimonial evidence presented at trial, the court finds that the GSA deed is not a final, integrated document with regard to the level of sewer service that the Navy must provide to RIPA and its successors-in-title. The evidence shows that the parties had agreed that the Navy would provide a specific amount of sewer service to the 28.8 acre parcel, and that the parties neglected to include the terms of this agreement in the GSA deed.

Representatives of both RIPA and the Navy testified that they specifically had discussed with GSA and Bend officials the quantity of sewer service that the Navy would supply to the 28.8 acre parcel, and that they had agreed to include these provisions in a service agreement separate from the GSA deed. Captain George Smith, who was the Public Works Officer at the Naval Education and Training Center in Newport, Rhode Island, at the time that the GSA deed was negotiated and executed, testified that "the service agreement would have been a document that talks about rates and a period of time, quantities and billing period, duration" (Tr. at 456), and that this agreement was "discuss[ed] at one of the meetings [the Navy] had with RIPA, GSA

**4.** In its February 2, 1993, Opinion denying summary judgment, the court stated that the original parties to the GSA deed were RIPA and Navy, not RIPA and GSA. *Coggeshall,* No. 90–3942L, slip op. at 6. The Navy's intentions regarding the provision of sewer service to the 28.8 acre parcel were critical, because the Navy continued to own and operate the sewer system that RIPA and its successors-in-title contracted to use. Nevertheless, the court recognizes that only GSA, not the Navy, is named as the property's grantor in the deed with RIPA.

**5.** Because the property at issue is located in the State of Rhode Island, and because Rhode Island law conforms to the general law of easements, Rhode Island law is persuasive in the instant case. *See Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 155, 64 S.Ct. 474, 480, 88 L.Ed. 635 (1944); *Royal Indemnity Co. v. United States,* 313 U.S. 289, 297, 61 S.Ct. 995, 998, 85 L.Ed. 1361 (1941); *Foster v. United States,* 607 F.2d 943, 221 Ct.Cl. 412, 420–21 (1979).

and the Bend people...." Tr. at 495. Virgil Nolan, who was Deputy Director of Finance and Administration for RIPA at the time that the GSA deed was negotiated and executed, testified that during the negotiations, RIPA "discussed sewer services and the lack thereof [with GSA]" and "advised that [RIPA] would have to ... make [its] own arrangements for sewer services or [RIPA] would have to work with, through the Navy for sewer services." Tr. at 598. Mr. Nolan explained that he was aware of the parties' agreement to limit effluent discharge from RIPA's property into the Navy's sewer system and testified that he "assumed that [the limitation] was going to be covered by the service agreement." Tr. at 604.

Both Captain Smith and Mr. Nolan suggested that the parties inadvertently may have omitted the service agreement from the GSA deed. When asked why the service agreement was not made part of the GSA deed, Mr. Nolan admitted that he did not know. Tr. at 604. Captain Smith testified that "a utilities agreement [is] normal between the Navy and a third party.... In discussions it was commented a document would be accompanying the sale. Whatever happened to it, I don't know. There should have been." Tr. at 495–96.

Melvin Zurier, Bend's attorney at the time the GSA deed was negotiated and executed, also acknowledged at trial that RIPA and Navy agreed to prepare a separate service agreement covering the Navy's sewer services to RIPA's property, and that the parties intended several different documents to address sewer service and other related issues:

> Q: You state in your memorandum, again Government's Exhibit 5, that ... "It was agreed that Vaccaro would attach a proposed service agreement to the sales agreement which would cover this...."
>
> A: I would assume that it was intended that there would be some other document. Or, Mr. Vaccaro said that he an-

ticipated that there would be some other document....

Tr. at 529:13–23; 530:1–4.

....

> Q: So in other words you expected several documents to be involved in connection with these issues?
>
> A: Yes.... These were just discussions that were taking place as to what would go into the documents later on at that time.

Tr. at 544:22–25; 545:1–2.

Three separate documents prepared by Mr. Zurier also support the conclusion that the GSA deed was not complete regarding sewer service. In a memorandum of a January 1976, meeting among representatives of RIPA, GSA, Bend, and the Navy, Mr. Zurier writes:

> It was agreed that ... the Navy would handle through its sewer line up to 12,000 gallons per day.... It was agreed that [Pat] Vaccaro [of GSA] would attach a proposed service agreement to the sales agreement which would cover this....

Defendant's Exhibit (Ex.) 5.

In a memorandum of a December 1976, meeting among representatives of RIPA, GSA, Bend, the Conservation Law Foundation, and the Army Corps of Engineers (Corps), Mr. Zurier states:

> Vaccaro noted that under the deed from GSA to [RIPA], there would be an undertaking by GSA to provide [12,000 gpd] by the United States Government to [RIPA] and this will appear in the deed itself.

Defendant's Ex. 39.

Finally, in a January 25, 1977, letter that he wrote to the Corps in response to the Corps' inquiry concerning the impact that Bend's proposed development would have upon various municipal services, Mr. Zurier explains:

> Sewerage—Reference is again made to paragraph 3 on page 14 of the Assessment and Negative Determination, the proposed deed from the United States Government and the enclosed letter of Captain G.L. Smith, Director for Public

Works of the Naval Education and Training Center in Newport dated 6 January 1977.

Defendant's Ex. 8.

The January 6, 1977, letter from Captain Smith, to which Mr. Zurier's letter referred, states:

> The Navy is willing to accept 12,000 gallons per day of sewerage from the Melville, North area which will include sewage from Bend Inc. facilities as well as from any other facilities that may be located in the Melville area.

*Id.*

By referencing documents other than the GSA deed itself to explain the sewer service provisions for the 28.8 acre parcel, Mr. Zurier's letter suggests that the GSA deed was not a complete expression of the parties' intent regarding sewer service.

■ Plaintiffs argue that RIPA and GSA did not include a specific sewage discharge limit in the GSA deed because the Navy intended to grant RIPA and its successors-in-title an easement of unlimited reasonable use. Plaintiffs contend that "where [an] easement is created by grant and is not limited in its scope by the terms of the grant, it is available for the reasonable uses to which the dominant estate may be devoted." *Friends of the Sakonnet v. Dutra,* 749 F.Supp. 381, 389 (D.R.I.1990) (quoting *Sharp v. Silva Realty Corp.,* 86 R.I. 276, 134 A.2d 131, 136 (1957)).

■ In resolving the instant dispute, the court's objective is to interpret the GSA deed consistent with the intent of the original contracting parties. *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed. Cir.1988); *Firestone Tire & Rubber Co. v. United States,* 444 F.2d 547, 195 Ct.Cl. 21, 30 (1971). The court will not read a reasonableness standard into the GSA deed's sewer service provision if doing so would conflict with the parties' original agreement. *See Beta Systems,* 838 F.2d at 1185; *Sakonnet,* 749 F.Supp. at 390; *Vallone v. City of Cranston, Dep't of Pub. Works,* 97 R.I. 248, 197 A.2d 310, 317 (1964).

The evidence that plaintiffs submit fails to support their proposition that the parties intended a reasonableness standard to govern the level of sewer service available to the property at issue. While six of plaintiffs' witnesses testified that they were unaware of any agreements to limit sewage discharge into the Navy's sewer system, none of these witnesses were parties to the original GSA deed. Tr. at 54, 64, 65, 132, 133, 142, 212, 213, 304, 337, 523. Moreover, of plaintiff's three witnesses who were present during any of the GSA deed's negotiations, one witness could not remember the relevant details of the meetings,[6] the second witness admitted that he had no personal knowledge of the parties' intentions regarding sewer service,[7] and the third witness' testimony tends to support the finding that the parties agreed that the Navy would provide only a specified level

---

**6.** Martin Temkin was a partner at Temkin, Meroula and Zurier, a law firm that represented Bend during the GSA deed's negotiations. Tr. at 24. Mr. Temkin testified:

Q: And do you remember what discussions there were [between GSA and RIPA]?
A: I can't give you the details of the discussions, frankly, at this late juncture, no.
Tr. at 38:17–18.
....
Q: Well, would it surprise you if you had said during the deposition in response to the question of "Do you recall the substance of whatever discussions you may have had with the GSA officials?" and your answer was "I do not"?
A: It's possible.
Tr. at 92:10–14.

Moreover, Mr. Temkin testified that he could not recall ever stating to any representatives from either RIPA, GSA, or the Navy that he understood that 12,000 gpd was not a limitation on Bend's use of the Navy's sewer system. Tr. at 105, 106, 107.

**7.** Daniel Varin was Secretary of the Rhode Island State Planning Council during the GSA deed's negotiations. Tr. at 295. Mr. Varin testified:

Q: [W]ould it be fair to say that you have no personal knowledge with respect to what [RIPA] and the ... Navy agreed with respect to the quantity of sewage that would be provided to this parcel, correct?
A: Yes.
Tr. at 315:19–24.

of sewer service to the 28.8 acre parcel.[8]

Plaintiffs' suggestion that a reasonableness standard governs the level of sewer service available to plaintiffs' property also conflicts with the construction of the GSA deed itself. Throughout the GSA deed, the parties clearly specify when the reasonableness standard applies to a particular provision.[9] Indeed, Mr. Zurier's testimony suggests that the parties understood that a reasonableness standard would not govern any provision absent GSA's explicit accession:

Q: And there's a reference to the use of a reasonableness standard in determining the time in order to obtain public utilities service?

. . . .

A: Yes.

Q: And do you know how, at whose request, that provision appeared in the deed?

A: Yes ... in our discussions.

Tr. at 547:11–13, 21–25; 548:1–2.

. . . .

Q: In fact, you asked the GSA to put in a reasonableness standard the method of determining the pro-rata costs of the use of the utility?

A: The pro-rata cost, yes.

Q: And that request was, was that approved or rejected by the—

A: I believe that was rejected. . . .

Tr. at 549:19–25.

Plaintiffs have failed to adduce sufficient evidence, however, showing that the parties even suggested that the Navy would provide a reasonable level of sewer service to RIPA's property.[10]

### 2. Terms of Extrinsic Agreement

■ Because the court finds that the GSA deed is not a final, integrated document regarding the level of sewer service that the Navy must provide to the property at issue, the court must determine what terms govern sewer service. Defendant argues that GSA, RIPA, and the Navy agreed that the Navy would allow RIPA and its successors-in-title to discharge up to 12,000 gpd of effluent into the Navy's sewer system, and that the Navy would have to authorize any increases in this level of sewer service. Plaintiff contends that the 12,000 gpd figure simply represented Bend's estimated effluent discharge at the time, and that the parties did not intend this figure to represent an upper limit on the amount of effluent that the Navy was willing to accept.

The evidence establishes that the parties to the GSA deed agreed that RIPA and its successors-in-title would be limited to discharging up to 12,000 gpd of effluent into the Navy's sewer system, and that the Navy had the authority to approve or deny any increases in this limit. Mr. Nolan testified that, as the agent appointed by RIPA

---

**8.** Melvin Zurier, was a partner at Temkin, Meroula and Zurier during the GSA deed's negotiations. Tr. at 500. Mr. Zurier testified:

Q: Now, you also say it was agreed, "it was agreed" that based on [the Navy's study of its sewer system's capacity] the Navy would handle through its sewer line up to 12,000 gallons per day. . . . What did you mean when you said it was "agreed" by the parties?
A: That the Navy had indicated its willingness and this was satisfactory to the other parties involved to handle through its sewer line up to 12,000 gallons per day.
Q: And why did you use the words "up to" 12,000 gallons per day?
A: The discussion at the meeting indicated that the Navy was willing to handle up to 12,000 gallons a day
. . . .

Tr. at 522:7–9, 17–21; 523:1–4. *See generally,* Tr. at 520–45.

**9.** The GSA deed provides, for example, that the grantee is conveyed "the right to erect a *reasonable* number of signs, consistent with *reasonable* safety requirements. . . ." and that the grantee "shall be allowed a *reasonable* time to obtain ... public utility water service. . . ." Plaintiff's Ex. A [emphasis added.]

**10.** Mr. Zurier admitted that he had no recollection of telling any GSA representative that he understood a reasonableness standard would govern the level of sewer service available to the property at issue, nor could he recall even asking GSA to include a reasonableness standard for sewer service. Tr. at 546, 550.

to negotiate the purchase of the 28.8 acre parcel from the United States, he understood that the Navy would accept no more than 12,000 gpd of effluent from RIPA's property, and that the Navy retained absolute discretion to determine whether it might increase the amount of service to be provided:

Q: Okay and looking at the first paragraph of that document [Defendant's ex. 3] it says, quote, "The Navy will permit 12,000 gallons per day of effluent to their system. If Bend, Inc. has need for additional effluent, Navy will have to judge the request in relation to Navy capacity." Yes?

A: Yes.

Q: Do you recall a conversation in which that statement was made?

A: I do indeed. Captain Smith sat at his desk ... and informed us this was the limitation of what we could have in the way of sewers.

Tr. at 580:14–24.

Mr. Nolan confirmed his understanding of the Navy's intentions in his December 1975, letter to John R. Fales, Sr., President of Bend, wherein he states that—

You will be limited to a 12,000 gallon per day input into the [Navy's sewer] system. If you have additional sewage handling requirements, we need to know the amount of such requirements and the approximate dates you will need the expanded service. It is possible that additional service will be available through the Navy System; however, your requirements must be projected into a study being performed by the Navy.

Defendant's Ex. 4.

Captain Smith's testimony further supports the court's findings. Captain Smith testified that, as the Public Works Officer responsible for managing and disposing of utility services at the Naval base in Newport, he concluded that the Navy would provide no more than 12,000 gpd of sewer service to RIPA's property, that this 12,000 gpd limitation was binding both upon RIPA and its successors-in-title, and that any requests for an increase in this limit would have to be submitted to and approved by the Navy:

Q: Was this [12,000 gpd] limitation applicable only to that deed, or to the successors-in-title also?

A: This limitation, it was my understanding and the commanding officer's understanding at the time, was that this amount needed to be connected at the [Bend] boat basin area for the disposition of the property.

. . . .

Q: But did [the 12,000 gpd limitation] apply to the successors[-in-title] also?

A: Yes, that was ... for that 28.8 acres.

Tr. at 494:3–17.

. . . .

Q: Were there any limitations regarding your authority concerning the sale of utility services?

. . . .

A: In the sale of utilities I was governed of course by the Navy regulations and instructions....

Tr. at 484:21–25; 485:2–4.

. . . .

Q: If there was need for an increase, how was that going to be handled?

A: It would have been by understanding that a request would have come in that would have been evaluated based on the criteria that we went through before.

. . . .

Q: [B]asically which entity had to act on this increase?

A: If there was a request for an increase, someone would have to come to the Navy and ask for an increase.

Tr. at 494:18–23; 495:10–14. *See generally* Tr. at 466–77; 487–88.

Captain Smith further testified that he communicated the Navy's position to RIPA and GSA, and that both agencies accepted the Navy's provisions. Tr. at 493.

The finding that the Navy had the authority to approve or reject any requests for increased sewer service is corroborated by the testimony of Daniel Varin, who rep-

resented the State of Rhode Island during the GSA deed's negotiations.[11] Mr. Varin testified that he had contacted Navy officials and that it was his understanding that the Navy was to make the decision whether to provide more that 12,000 gpd of sewer service at any future time:

Q: And, in addition, did you come to any conclusion based upon the reports, regarding future use of the system?

A: We concluded that any future uses would have to be reviewed at the time that they became sufficiently specific to make an estimate of their sewage effluent discharge.

Tr. at 303:21–25.

. . . .

Q: Would it be fair to say, then, from that statement, that you understood whether any additional effluent would be permitted by the Navy would be reviewed by the Navy?

A: Yes.

Tr. at 311:15–19.

. . . .

Q: [Y]ou did state that there would be an allowed 12,000 gallons per day, unless the Navy, after review, should deny heavier flows through their system?

A: Yes.

Q: So, it was the discretion of the Navy, it was your understanding, was it not, that it was the Navy which had the discretion to deny heavier flows through its system?

A: Yes.

Tr. at 317:19–25; 318:1.

. . . .

Q: Now, looking at the second paragraph of [defendant's Ex. 4] it says, "sewage service at the small boat basin will be handled through the Navy system. You will be limited to a 12,000 gallon per day input into the system."

Do you recall what your source was for making those two sentences?

A: Captain Smith informed us that was the maximum amount that we could put into the system.

Tr. at 583:21–25; 584:1–3.

. . . .

Q: Do you remember who told you that you would be limited to 12,000 gallons per day?

A: Yes, Captain Smith.

Tr. at 589:16–18.

. . . .

Q: Do you recall what was discussed at [a 1986 meeting with Bend's principals] when the topic of accelerating the option [to buy the property] was addressed?

A: I first reminded them of the 12,000 gallon a day limitation on the [sewer] service.

Tr. at 600:3–7.

Mr. Varin's testimony is supported by his May 1976, memorandum to the State Planning Council, in which he explains that—

The Navy will allow 12,000 gallons per day of effluent through their collection system at this time and additional future needs will be reviewed. The Rhode Island Department of Health feels that effluent estimates . . . are not likely to pose a problem even if they exceed the allowed 12,000 gallons per day unless the Navy, after review, should deny heavier flows through their system.

Defendant's Ex. 19.

Finally, a variety of additional documents support the court's conclusion that the parties to the GSA deed agreed that RIPA and its successors-in-title would be limited to discharging up to 12,000 gpd of effluent into the Navy's sewer system and that the Navy would have to authorize any limitation increases.[12]

---

11. Daniel Varin was Secretary of the Rhode Island State Planning Council during the GSA deed's negotiations. Tr. at 295. While Mr. Varin's agency, the Rhode Island State Planning Council, was not a party to the GSA deed, Mr. Varin's testimony is relevant to the extent that it reflects the Navy's intentions regarding sewer service for the property at issue.

12. A December 10, 1975, interoffice memorandum from Charles Vernon to Mr. Nolan at RIPA explains that:

The Navy will permit 12,000 gallons per day of effluent to their system. If Bend, Inc. has need for additional effluent, Navy will have to judge the request in relation to Navy capacity.

### 3. *Defendant's Liability*

█ Plaintiffs argue that, even if the parties to the GSA deed agreed to limit effluent discharge into the Navy's sewer system to 12,000 gpd, defendant still is liable for plaintiffs' alleged losses. Plaintiffs contend that neither GSA nor the Navy has the authority to restrict the use of surplus land. *Conservation Law Found. of New England, Inc. v. General Serv. Admin.*, 707 F.2d 626, 630 (1st Cir. 1983); *Conservation Law Found. v. Kline,*

Defendant's Ex. 3.
A January 3, 1977, letter from Edward Spinard (Rhode Island Department of Economic Development) to Captain Howard Kay (Navy) states:
It would ... be helpful to [the Army Corps of Engineers'] evaluation if you could furnish us the following information:
Documentation that the Navy is willing to accept 12,000 gallons per day of sewerages from Bend, Inc.....
Defendant's Ex. 6.
A January 6, 1977, letter from Captain George Smith (Navy) to Edward Spinard indicates that:
The Navy is willing to accept 12,000 gallons per day of sewerage from the Melville, North area which will include sewage from Bend, Inc. facilities as well as from any other facilities that may be located in the Melville area.
Defendant's Ex. 7.
A January 25, 1977, letter from Melvin Zurier to Kenneth Jackson (Army Corps of Engineers) explains:
Sewerage—Reference is again made to ... the enclosed letter of Captain G.L. Smith ... dated 6 January 1977 [defendant's Ex. 7].
Defendant's Ex. 8.
A May 11, 1977, Army Corps of Engineers § 403 Development Permit issued to Bend indicates:
The Navy will allow 12,000 gallons per day through their collection system.
Defendant's Ex. 9.
A March 18, 1980, letter from Captain G.E. Pillow (Navy) to RIPA explains:
When the Bend Boat Basin Development at Melville was in the planning stage, the Navy agreed to provide ... limited sewer service to the development through the Navy-owned utility systems. ... As part of the agreement to receive 12,00 gallons per day of sewage from the boat basin area into the Navy system, Bend agreed....
Defendant's Ex. 13.
A March 19, 1980, letter from Virgil Nolan to J.R. Fales (Bend) states:
Enclosed is a letter from Captain Pillow [Defendant's Ex. 13] complaining about your failure to comply with the terms of the agreement covering water and sewer services provided by the Navy.

16 Env't Rep. Case (BNA) 1985, 1993, 1981 WL 137992 (D.R.I.1981). By declining to accept more than 12,000 gpd of effluent from plaintiffs' 28.8 acre parcel, however, the Navy has not limited plaintiffs' use of their property. Rather, the Navy has restricted plaintiffs' use of the sewer system adjacent to plaintiffs' land, which the Navy still owns and operates.[13] Pursuant to 10 U.S.C. § 2481(a) (1988), the Navy has the authority to control the sewage service that it provides to plaintiffs' property.[14]

Defendant's Ex. 12.
Finally, a May 6, 1976, letter from James Robertson (Rhode Island Department of Economic Development) to Daniel Varin indicates:
The Navy will allow, at this time, 12,000 gallons per day of effluent to their system. Additional need will be reviewed by the Navy.
Defendant's Ex. 34.

**13.** Joint Stipulation of Facts at 6, para. 17 (Fed. Cl. filed May 19, 1993).

**14.** Section 2481(a) of 10 U.S.C. provides that—

Under such regulations and for such periods and at such prices as he may prescribe, the Secretary concerned or his designee may sell or contract to sell purchasers within or in the immediate vicinity of an activity of the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be, any of the following utilities and related services, if it is determined that they are not available from another local source and that the sale is in the interest of national defense or in the public interest: ... (5) Sewage and garbage disposal. Section 2481(a) is implemented by instructions promulgated by the Secretary of the Navy, which were effective at the time that GSA sold the 28.8–acre parcel to RIPA and at the time that plaintiffs acquired the property. These instructions provide that—
It is the policy of the Department of the Navy to limit the extension of utilities services to private parties to only those instances where the statutory requirements are met and where the supply of such services will not interfere with the mission of the activity.
....
[A]uthority over matters relating to the sale and furnishing of utilities and related services to purchasers is delegated to the Chief of Naval Operations and Commandant of the Marine Corps to act for the Secretary in all matters relating thereto.
SECNAVINST 11300.1A (March 1, 1971). Defendant's ex. 30. A similar provision appears in the Navy Comptroller Manual § 035875(2)(e), which also was in effect when GSA sold the property to RIPA and when plaintiffs acquired

Plaintiffs have not shown that either the Navy's 1978 determination to limit sewer service to 12,000 gpd, or the Navy's 1988 decision that the Navy would not provide additional sewer service was arbitrary, capricious, or an abuse of the Navy's discretion.[15] *See* Plaintiff's Ex. P.

■ In the alternative, plaintiffs argue that the 12,000 gpd limitation should not be binding upon them because this limitation is not referenced in their chain of title to the property at issue. The court disagrees. First, as the assignee of RIPA and Bend, plaintiffs' right to use the Navy sewer system cannot exceed that of RIPA, its assignor. *See Unity Bank & Trust Co. v. United States*, 5 Cl.Ct. 380, 384 (1984), *aff'd*, 756 F.2d 870 (Fed.Cir.1985); *Produce Factors Corp. v. United States*, 467 F.2d 1343, 199 Ct.Cl. 572, 582 (1972); *Nat'l City Bank of Evansville v. United States*, 163 F.Supp. 846, 143 Ct.Cl. 154, 163 (1958). The evidence presented at trial established that RIPA was aware of, and agreed to, a 12,000 gpd limitation on the effluent that it could discharge into the Navy's sewer system. Thus, plaintiffs cannot now recover from defendant for the Navy's refusal to provide more than 12,000 gpd of sewer service.

Moreover, it is a well-established proposition in this court that "[w]hen a contractor is faced with an obvious omission ... of significance, he is obligated to bring the situation to the government's attention if he intends subsequently to resolve the issue in his own favor." *Space Corp. v. United States*, 470 F.2d 536, 200 Ct.Cl. 1, 5–6 (1972). *See also, Beacon Constr. Co. v. United States*, 314 F.2d 501, 161 Ct.Cl. 1, 6–7 (1963). Indeed, the contractor should

"make certain that the omission was deliberate, if he intends to take advantage of it." *James A. Mann, Inc. v. United States*, 535 F.2d 51, 210 Ct.Cl. 104, 122–23 (1976) (*quoting Ring Constr. Corp. v. United States*, 162 F.Supp. 190, 142 Ct.Cl. 731, 734 (1958)).[16]

In the instant case, plaintiffs were faced with an obvious omission of significance and failed to address it before purchasing the property. The GSA deed lacks any provision whatsoever regarding the level of sewer service that the Navy must provide to the 28.8 acre parcel. Sewer service, however, was an issue sufficiently important to obligate plaintiffs to investigate before purchasing the property. *See Max Drill, Inc. v. United States*, 427 F.2d 1233, 192 Ct.Cl. 608, 625 (1970).

Plaintiffs had ample notice that sewer service was an important issue needing clarification. The Portsmouth Zoning Ordinance (Ordinance) advised that the Zoning Board of Review would not approve any proposed development unless "the sewer line(s) to which it shall be connected, have adequate capacity to carry the additional effluent created by the development." Defendant's Ex. 21. Thomas McLaughlin, president of Coggeshall Development and Coggeshall Marina, testified that he was familiar with the Ordinance before purchasing the property. Tr. at 173. He acknowledged the significance of sewer service by testifying that he purchased the property solely in order to develop it for residential use, which was contingent upon the availability of adequate sewer service. Tr. at 148.

the property. Defendant's ex. 32. *See also,* Tr. at 448, 466–77, 487–88.

**15.** Both plaintiffs' and defendant's experts testified that the Navy's existing sewer system cannot accommodate plaintiff's requested discharge of 72,000 gpd. Tr. at 276, 408, 412. Plaintiff contends, however, the Navy's sewer system cannot accept 72,000 gpd of effluent because the Navy failed to adequately maintain the system, thereby violating the GSA deed's provision that the Navy "will maintain its sewer mains and appurtenances which connect the sewer lines in

the fee area to the City of Newport's public sewer system." Contrary to plaintiffs' contention, however, the testimony of both experts shows that, regardless of any repairs that are made, the Navy's sewer system could accommodate 72,000 gpd of discharge only if the Navy upgraded the system's design, which the GSA deed does not obligate the Navy to do. Tr. at 249, 250, 251, 408, 409, 412.

**16.** These rules also apply in the instant case, where plaintiffs' property rights under the GSA deed are entirely derivative of RIPA's rights.

In addition to the Ordinance, Mr. McLaughlin's architects also alerted him to the significance of, and need to define, sewer service terms for the 28.8 acre parcel. On December 16, 1986, two weeks before purchasing the property, Mr. McLaughlin wrote to his architects to request their review of the Portsmouth Zoning Ordinances. Defendant's Ex. 15; Tr. at 160, 200. James McQueen, representing plaintiffs' architects, responded in a letter dated December 22, 1986, in which he indicated that an issue remained regarding sewer service available to the property. Specifically, Mr. McQueen stated that—

> [I]t is unclear to us whether the "Navy sewer" is considered an onsite or offsite system.... We will require ... clarification of the type and extent of the navy sewer in order to determine the total number of units that may be built on the site.

Defendant's Ex. 16.[17]

Finally, the sublease between Bend and TPI should have notified Mr. McLaughlin that sewer service to the 28.8 acre parcel may be limited. The section of the sublease entitled "Utilities and Other Charges" provides:

> Bend will at its expense cause ... sewer service to be delivered to the exterior of Building 117. If the Sewage capacity available to the parcel shall not be sufficient to service the needs of TPI and

other occupants of the parcel, the parties agree that BEND may limit the capacity utilized by TPI to an amount reasonably proportionate to the overall requirements of the parcel.

The mortgage between Bend and Coggeshall Development, executed on December 5, 1986, stated specifically that it was subject to the sublease between Bend and TPI. Defendant's Ex. 18. The Bend–TPI sublease was on record at the Portsmouth Records of Land Evidence,[18] in plaintiff's chain of title and in plaintiffs' possession before plaintiffs purchased the property. Tr. at 153, 154, 229.

Despite these notices, neither Mr. McLaughlin nor any of his agents made any inquiry to RIPA, GSA, Bend, or the Navy regarding either the adequacy of Navy's sewer system or the level of service that the Navy was willing to provide before purchasing the property.[19] A prudent real estate developer like Mr. McLaughlin,[20] intending to develop a large condominium complex and aware that sewer service is provided by an active military installation,[21] should have made such an inquiry. *See, e.g., P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 917 (Fed.Cir. 1984); *H.N. Bailey & Assocs. v. United States*, 449 F.2d 387, 196 Ct.Cl. 156, 163 (1971).[22] His failure to do so now bars his companies from recovering damages related to this missing contract term. *See Flex-*

**17.** Mr. McLaughlin testified that he was uncertain whether he received Mr. McQueen's letter before or after the closing. Tr. at 163. Nevertheless, his agent—Mr. McQueen—had knowledge of the need to ascertain the level of sewer service available through the Navy in order to determine the property's development potential.

**18.** Joint Stipulation of Facts at 4, para. 9 (Fed. Cl. filed May 19, 1993).

**19.** In his testimony, Mr. McLaughlin stated that neither RIPA, the United States Government, nor Bend had advised him that there was any limitation on the use of the Navy sewer system. Tr. at 133, 196. He later testified, however, that he never asked these entities whether any limitation existed before purchasing the property. Tr. at 158, 163, 175, 176, 180, 198.

**20.** Mr. McLaughlin testified that he had worked exclusively and extensively in real estate development from the time that he earned his Master

of Business Administration in 1977 to the time that he purchased the property at issue in 1986. Tr. at 119.

**21.** In his testimony, Mr. McLaughlin explained that he had dealt with the acquisition of utility services in former development projects, that he knew that the Navy owned the sewer system that would be servicing the property, and that this was the first time he was involved in a development plan requiring the services of the Navy. Tr. at 178, 162.

**22.** In addition, available on public record were a number of documents indicating that the Navy would allow only 12,000 gpd of effluent discharge into its sewer system from the property at issue, and that the Navy must authorize any increases in this discharge limit. *See, e.g.,* defendant's Ex. 3, 7, 13, 19, 34.

**278**

*ible Metal Hose Mfg. Co. v. United States*, 4 Cl.Ct. 522, 528–29 (1984), *aff'd*, 765 F.2d 156 (Fed.Cir.1985); *Johnson Controls, Inc. v. United States*, 671 F.2d 1312, 229 Ct.Cl. 445, 459 (1982); *Jefferson Constr. Co. v. United States*, 151 Ct.Cl. 75, 89–91 (1960); *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 705 (1984). Thus, the court finds that the Navy did not violate the GSA deed by refusing to provide plaintiffs a level of sewer service in excess of 12,000 gpd.

### *Conclusion*

For the reasons stated above, the court finds that defendant did not breach its contract with plaintiff. Accordingly, the Clerk is directed to enter judgment in favor of defendant. No costs.